# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>THE STATE OF NEW JERSEY; PHILIP D. MURPHY, in his Official Capacity as Governor of New Jersey; GURBIR S. GREWAL, in his Official Capacity as Attorney General of New Jersey,<br><br>    Defendants. | Hon. Freda L. Wolfson, U.S.D.J.<br>Hon. Tonianne J. Bongiovanni, U.S.M.J.<br><br>CIVIL ACTION NO.<br>3:20-CV-1364-FLW-TJB<br><br>**<u>CIVIL ACTION</u>**<br><br>**(ELECTRONICALLY FILED)**<br><br>Motion Return Date: July 20, 2020 |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT IN LIEU OF AN ANSWER

Jeremy Feigenbaum
Daniel M. Vannella
Michael C. Walters
Assistant Attorneys General
  Of Counsel and on the Brief


Bryan Edward Lucas
Michael R. Sarno
Marie Soueid
Emily K. Wanger
Deputy Attorneys General
  On the Brief

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
25 Market Street
P.O. Box 116
Trenton, New Jersey 08625
Attorney for Defendants, State of New
  Jersey, Philip D. Murphy, and Gurbir S.
  Grewal

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS .....................................................................................3

    A.     Federal Immigration Law.......................................................................3

    B.     Immigrant Trust Directive......................................................................6

    C.     The Instant Lawsuit ..............................................................................11

STANDARD OF REVIEW ...................................................................................12

ARGUMENT ......................................................................................................12

I.     SECTION II.B.5 OF THE IMMIGRANT TRUST DIRECTIVE DOES NOT VIOLATE THE SUPREMACY CLAUSE..........................................12

    A.     Section II.B.5 Of The Immigrant Trust Directive Is Not Preempted..12

          i.     *The INA Does Not Expressly Preempt Section II.B.5*...............13

          ii.    *The INA Does Not Otherwise Preempt Section II.B.5* ..............17

          iii.   *The Canon of Constitutional Avoidance Bolsters The Conclusion That The INA Does Not Preempt The Directive* ....................................................................................21

    B.     Section II.B.5 Of The Immigrant Trust Directive Does Not Violate The Intergovernmental Immunity Doctrine .........................................31

II.    SECTION VI.A OF THE IMMIGRANT TRUST DIRECTIVE DOES NOT VIOLATE THE SUPREMACY CLAUSE..........................................33

CONCLUSION ...................................................................................................40

i

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Arizona v. United States*,
    567 U.S. 387 (2012)...............................................................*passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................12

*Bond v. United States*,
    572 U.S. 844 (2014)........................................................................22

*Chamber of Commerce of U.S. v. Whiting*,
    563 U.S. 582 (2011)..................................................................37, 38

*City of Chicago v. Barr*,
    957 F.3d 772 (7th Cir. 2020), *as amended by*, 2020 WL 3037242
    (June 4, 2020)..........................................................................19, 27

*City of Chicago v. Sessions*,
    321 F. Supp. 3d 855 (N.D. Ill. 2018).....................................26, 28, 29

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018), *vacated in part on other grounds*,
    2018 WL 4268817 (7th Cir. June 4, 2018)...............................18, 19

*City of Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018), *aff'd in part & vacated in*
    *part on other grounds*, 916 F.3d 276 (3d Cir. 2019).................*passim*

*Davis v. Mich. Dep't of the Treas.*,
    489 U.S. 803 (1989)..................................................................31, 33

*De Canas v. Bica*,
    424 U.S. 351 (1976)..........................................................................3

*Galarza v. Szalczyk*,
    745 F.3d 634 (3d Cir. 2014) ....................................................21, 24

*Guerrero-Sanchez v. Warden York Cty. Prison*,
    905 F.3d 208 (3d Cir. 2018) ...........................................................22

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .................................................................................37

*Kansas v. Garcia*,
  140 S. Ct. 791 (2020) .....................................................................21, 37

*Lamar, Archer & Cofrin, LLP v. Appling*,
  138 S. Ct. 1752 (2018) .........................................................................15

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  138 S. Ct. 1461 (2018) .................................................................*passim*

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers
  Ins. Co.*,
  514 U.S. 645 (1995) ...............................................................................15

*Nat'l Fed. of Indep. Bus. v. Sebelius* (*NFIB*),
  567 U.S. 519 (2012) ...............................................................................23

*New York v. Dep't of Justice*,
  951 F.3d 84 (2d Cir. 2020) .............................................................29, 30

*New York v. United States*,
  505 U.S. 144 (1992) ...............................................................................23

*Nixon v. Mo. Mun. League*,
  541 U.S. 125 (2004) .....................................................................26, 30, 39

*North Dakota v. United States*,
  495 U.S. 423 (1990) .........................................................................31, 40

*O'Shea v. Twp. Of W. Milford*,
  982 A.2d 459 (N.J. App. Div. 2009) ......................................................6

*Oregon v. Trump*,
  406 F. Supp. 3d 940 (D. Or. 2019) ..................................................28, 29

*Paff v. Ocean Cty. Prosecutor's Office*,
  192 A.3d 975 (N.J. 2018) ........................................................................6

*Parker v. Brown*,
  317 U.S. 341 (1943) ...............................................................................19

*Philips v. Cty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ...............................................................12

*Printz v. United States*,
521 U.S. 898 (1997)...........................................................22, 23, 24

*San Francisco v. Sessions*,
349 F. Supp. 3d 924 (N.D. Cal. 2018).....................................24, 26, 29

*St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the V.I.*,
218 F.3d 232 (3d Cir. 2000) ...............................................................13

*Steinle v. San Francisco*,
919 F.3d 1154 (9th Cir. 2019) ......................................................15, 16

*Treasurer of N.J. v. U.S. Dep't of the Treas.*,
684 F.3d 382 (3d Cir. 2012) ...............................................................31

*United States v. California*,
314 F. Supp. 3d 1077 (E.D. Cal. 2018) .............................................33

*United States v. California*,
921 F.3d 865 (9th Cir. 2019), *cert. denied*, No. 19-532 (U.S. June
15, 2020) ......................................................................................*passim*

*United States v. Morrison*,
529 U.S. 598 (2000)...........................................................................30

*Washington v. United States*,
460 U.S. 536 (1983)...........................................................................31

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)...........................................................................17

## Statutes

8 U.S.C. § 1101 *et seq.*...................................................................*passim*

8 U.S.C. § 1151(a) ...............................................................................4

8 U.S.C. § 1182.....................................................................................15

8 U.S.C. § 1226..........................................................................4, 20, 38

8 U.S.C. § 1227(a)(2) ........................................................................5

8 U.S.C. § 1231 ....................................................................4, 20, 38

8 U.S.C. § 1231(a)(4) .........................................................................5

8 U.S.C. § 1357(g)(1) .........................................................................6

8 U.S.C. § 1357(g)(9) .........................................................................6

8 U.S.C. § 1357(g)(10) .......................................................................6

8 U.S.C. § 1357(g)(10)(A) ...............................................................14

8 U.S.C. § 1360(b) ...........................................................................16

8 U.S.C. § 1360(c) ...........................................................................16

8 U.S.C. § 1373(a) .....................................................................*passim*

8 U.S.C. § 1373(c) .............................................................................5

8 U.S.C. § 1644 ...............................................................................13

28 U.S.C. § 3702(1) .........................................................................25

N.J. Stat. Ann. §§ 52:17B-97 to -117 .................................................6

N.J. Stat. Ann. § 52:17B-98 ...............................................................6

## Other Authorities

U.S. Const. Amend X.................................................................*passim*

8 C.F.R. § 287.7(a).......................................................................5, 21

Department of Homeland Security, Immigration Detainer - Notice of
    Action, available at
    https://www.ice.gov/sites/default/files/documents/Document/2017/
    I-247A.pdf (last accessed June 17, 2020).........................................36

Fed. R. Civ. P. 12(b)(6) .................................................................................... 12

St. John & Rubin, "ICE Held an American Man in Custody for 1,273
    Days," *L.A. Times* (Apr. 27, 2018) ..................................................... 35

Department of Homeland Security, Immigration Detainer - Notice of
    Action, available at
    https://www.ice.gov/sites/default/files/documents/Document/2017/
    I-247A.pdf (last accessed June 17, 2020) ........................................... 36

## **PRELIMINARY STATEMENT**

State and local law enforcement officers fulfill a critical role in keeping the public safe from harm. To do the hard work of solving crimes and bringing criminals to justice, New Jersey law enforcement officers rely on the trust they have built over the years with the communities they serve, including the State's diverse immigrant communities. Part of building that trust means making clear to New Jersey residents that an interaction with state and local law enforcement—whether as the victim of domestic violence or as an eyewitness to a violent crime—will not end with their deportation, no matter their immigration status. That promise is critical because both studies and common sense confirm that immigrants are less likely to report a crime if they fear that responding officers might turn them over to immigration authorities. And if victims and witnesses refuse to cooperate, it is that much more challenging to remove criminals from the streets, putting all New Jersey residents at risk.

The Immigrant Trust Directive, issued by Defendant Attorney General Gurbir S. Grewal on November 29, 2018, addresses those concerns directly. The Directive seeks to draw a line between the law enforcement officers responsible for enforcing state criminal law and the federal immigration authorities responsible for enforcing federal immigration law. The Directive does this by placing limits on when state and local officers may voluntarily assist in the enforcement of federal immigration law above and beyond the situations in which federal law requires them to do so. Among

1

other things, the Directive says that New Jersey's state and local law enforcement officers cannot participate in civil immigration raids or arrest persons solely based on their immigration status. And the Directive also places limits on the situations in which state and local law enforcement officers can refer residents for deportation by sharing their personal information with federal immigration authorities, empowering them to do so only when such information sharing is required by federal law or when it would help law enforcement transfer certain criminals and violent individuals to federal immigration detention and keep them off the streets.

The Federal Government seeks to frame its lawsuit as one that challenges the State's decision to impinge upon federal immigration law. Nothing could be further from the truth. While the Federal Government correctly alleges that the Constitution grants it broad power to set the rules governing immigration and to enforce them as it sees fit—subject as always to constitutional restrictions—that is beside the point. The State agrees that the Federal Government sets criteria governing admission to this country, and the State agrees that the Federal Government decides whether and when an alien should be removed. But that is also why the Federal Government— not the States—maintains an enforcement apparatus for detaining and removing non-citizens, and that is also why federal immigration authorities, rather than state law enforcement officers, are the ones to decide whether, when, and how to detain those non-citizens. Nothing in the Immigrant Trust Directive suggests otherwise.

The only questions presented in this case are whether State governments can decide for themselves what voluntary assistance their law enforcement officers may provide to federal immigration authorities enforcing federal immigration law, and what information law enforcement officers may share with their detainees. As every court to directly consider the question has held, nothing in the Immigration and Nationality Act (INA) preempts the State's decision to limit the voluntary assistance it provides in civil immigration operations or to set rules governing information-sharing with its detainees. Nor could it. Under the Tenth Amendment, the Federal Government may not conscript state and local law enforcement officers into federal service. Nor may it order the States to refrain from adopting policies that limit participation in federal enforcement initiatives, or limit the States' exercise of their police powers in managing their jails. The Complaint must be dismissed.

## STATEMENT OF FACTS

### A. Federal Immigration Law

The Federal Government enjoys broad authority when it comes to setting and enforcing immigration policy. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). In general, and subject to constitutional requirements, the United States can determine "who should or should not be admitted into the country," as well as "the conditions under" which they may remain. *De Canas v. Bica*, 424 U.S. 351, 355 (1976). Congress has set out the Nation's immigration policy in the Immigration and

3

Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, which prescribes criteria for admission to the United States and establishes "which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396; *see also, e.g.*, 8 U.S.C. §§ 1151(a), 1226, 1231. These statutes establish a comprehensive federal enforcement apparatus for detaining and removing non-citizens. Under federal law, the Department of Homeland Security (DHS) "play[s] a major role in enforcing the country's immigration laws," and its Immigration and Customs Enforcement (ICE) officers are "responsible for the identification, apprehension, and removal of" those who are unlawfully in the country. *Arizona*, 567 U.S. at 397.

In passing the INA, Congress allowed state and local law enforcement officers to assist federal agents in enforcing immigration laws. Among other things, the INA permits such officers to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10). Such assistance can "include situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. at 410.

The INA also allows federal officials to ask state and local officers for help in transferring certain immigrants from state criminal custody to federal immigration detention. Because federal agents can remove immigrants who commit state crimes

4

only after they complete their state sentences (with certain limited exceptions), *see* 8 U.S.C. §§ 1227(a)(2) & 1231(a)(4), ICE can ask state and local law enforcement officers to provide advance notice of the date a specific immigrant will be released from state custody. *See Arizona*, 567 U.S. at 410. Typically, ICE will ask for this information by issuing "detainers," which are "requests that [the state or local law enforcement] agency advise [DHS], prior to release of [an] alien, in order for [DHS] to arrange to assume custody." 8 C.F.R. § 287.7(a).

In contrast to the voluntary detainers described above, the INA issues just one direct command to the States. Section 1373 says that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). For its part, ICE "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." *Id.* § 1373(c).

The INA also permits state and local law enforcement agencies to choose to participate in immigration enforcement directly under federal supervision by signing formal agreements with the Federal Government known as "287(g) agreements."

5

The federal law establishing such agreements says that "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State pursuant to which" state or local law enforcement may perform the "function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g)(1). Any such agreement may be carried out only "to the extent consistent with State and local law." *Id.* The INA explains that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement." *Id.* § 1357(g)(9).

## B. Immigrant Trust Directive

The New Jersey Attorney General is the "chief law enforcement officer of the State." N.J. Stat. Ann. § 52:17B-98. As such, the Criminal Justice Act of 1970, N.J. Stat. Ann. §§ 52:17B-97 to -117, grants the Attorney General "power to adopt guidelines, directives and policies that bind law enforcement throughout" the State. *Paff v. Ocean Cty. Prosecutor's Office*, 192 A.3d 975, 986 (N.J. 2018). The Attorney General's guidelines, directives, and policies all bind local law enforcement "in the day-to-day administration of the law enforcement process." *O'Shea v. Twp. Of W. Milford*, A.2d 459, 465 (N.J. App. Div. 2009). Attorneys General have used this authority nearly 75 times in the past two decades, including to address important and sensitive issues, from Attorney General Peter Harvey's Directive barring racially-

influenced policing (Directive 2005-1) to Attorney General Christopher Porrino's Directive implementing the State's criminal justice reform law (Directive 2016-6).

New Jersey Attorneys General have also relied on this authority to address state and local law enforcement cooperation with federal immigration authorities. In 2007, then-Attorney General Anne Milgram issued Directive 2007-3 to "establish the manner in which local, county, and state law enforcement agencies and officers shall interact with federal immigration authorities." Directive 2007-3 at 1. Her Directive explained that the "enforcement of immigration law is primarily a federal responsibility" and that the overriding mission of state and local law enforcement officers must be "to enforce the state's criminal laws and to protect the community that they serve." *Id.* The Directive thus placed certain limits on when state and local law enforcement officers could participate in federal civil immigration efforts.

In November 2018, Attorney General Grewal promulgated Directive 2018-6, known as the Immigrant Trust Directive, to update the State's rules. The Immigrant Trust Directive explains that new guidance was appropriate because ongoing state and local participation in federal immigration enforcement operations "present[ed] challenges to New Jersey's law enforcement officers, who have worked hard to build trust with [the] state's large and diverse immigrant communities." Directive 2018-6 (Appx. A), at 1 (introductory clauses). "It is well-established," the Directive notes, that immigrants will be "less likely to report a crime if they fear that the responding

7

officer will turn them over to immigration authorities." *Id.* And if such individuals are afraid to approach law enforcement as victims or to cooperate as witnesses, it is "more difficult for officers to solve crimes and bring suspects to justice, putting all New Jerseyans at risk." *Id.* The objective of the Directive is thus to draw a clear line between New Jersey's "state, county, and local law enforcement officers, who are responsible for enforcing state *criminal law*, and federal immigration authorities, who enforce federal *civil immigration law*." *Id.* (emphasis in original).

To be clear, even with those concerns in mind, the Directive describes many instances in which New Jersey law enforcement officers either can or must provide assistance to federal civil immigration authorities. Importantly, the Directive notes that "law enforcement officers should assist federal immigration authorities when required to do so by law." *Id.*; *see also id.* ("[N]othing in this Directive restricts New Jersey law enforcement agencies or officers from complying with the requirements of Federal law or valid court orders, including judicially-issued arrest warrants for individuals, regardless of immigration status."). Beyond mandating compliance with judicial warrants and court orders, *id.* § II.C.3, the Directive says "nothing" in its terms "restrict[s], prohibit[s], or in any way prevent[s] a state, county, or local law enforcement agency or official from … [s]ending to, maintaining, or receiving from federal immigration authorities information regarding the citizenship or immigration

status, lawful or unlawful, of any individual," using the same language that Congress

employed in the INA. *See id.* § II.C.10 (citing 8 U.S.C. §§ 1373 & 1644).

      The Directive also makes clear that New Jersey law enforcement officers need

to comply with state law. As the Directive puts it, "[n]othing" in the Directive "shall

be construed to restrict, prohibit, or in any way prevent a state, county, or local law

enforcement agency or official from … [e]nforcing the criminal laws of this state."

*Id.* § II.C.1. For that reason, the Directive makes clear, the State is not "provid[ing]

'sanctuary' to those who commit crimes in this state. Any person who violates New

Jersey's criminal laws can and will be held accountable for their actions, no matter

their immigration status." *Id.* at 1 (introductory clauses).

      The only issue that the Directive addresses is whether and when New Jersey

officers can provide voluntary assistance to federal civil immigration enforcement

efforts "above and beyond" the requirements of federal law. *Id.* at 1-2 (introductory

clauses). The Directive limits, but does not foreclose, such assistance. The Directive

states that law enforcement officers cannot "[s]top, question, arrest, search, or detain

any individual based solely on: actual or suspected citizenship or immigration status;

*or* actual or suspected violations of federal civil immigration law." *Id.* § II.A.1. The

Directive prevents officers from "[p]articipating in civil immigration enforcement

operations." *Id.* II.B.1. And it explains that such officers cannot provide "any non-

public personally identifying information regarding any individual" or grant "access

to any … database" to federal agents when the "sole purpose of that assistance is to enforce federal civil immigration law." *Id.* § II.B.3-4.

But when it comes to the transfer of individuals from state criminal custody to federal immigration detention, the Directive permits some assistance. While law enforcement officers cannot "[p]rovid[e] notice of a detained individual's upcoming release from custody" to immigration agents for a low-level offender, such officers can provide ICE with advance notice of the release date for any inmate who "in the past five years, has been convicted of an indictable crime," or for any inmate who is charged with, or has ever been convicted of, a wide range of offenses, including any first or second degree crime, domestic violence assault, or other violent or serious offense. *Id.* § II.B.5. Likewise, law enforcement officers can provide advance notice of release, regardless of the severity of prior criminal history, for any inmate who is "subject to a Final Order of Removal that has been signed by a federal judge." *Id.* Officers are permitted to detain these inmates "until 11:59 pm on the calendar day on which the person would otherwise have been eligible for release." *Id.*

Additionally, the Directive includes a "notification" provision, requiring state, county, and local law enforcement officers to "promptly notify a detained individual, in writing and in a language the individual can understand" whenever "federal civil immigration authorities request: (1) to interview the detainee; (2) to be notified of the detainee's upcoming release from custody; (3) to continue detaining the detainee

10

past the time he or she would otherwise be eligible for release." *Id.* § VI.A. The Directive mandates that agencies must provide the detainee a copy of any documents provided by immigration authorities in connection with the request. *Id.*

### C. The Instant Lawsuit

On February 10, 2020, the Federal Government filed a Complaint seeking Declaratory and Injunctive Relief against the State, Governor Philip D. Murphy, and Attorney General Grewal. The Complaint asserts two violations of the Supremacy Clause. First, it asserts that Sections II.B.5 and VI.A of the Directive are preempted by the INA. *See Compl.* ¶¶ 38-39. Second, the Complaint asserts that these sections discriminate against the United States. *Id.* ¶¶ 40-41. The Federal Government seeks a declaration that the Directive is invalid and unenforceable. More specifically, the Complaint asserts that the Directive conflicts with federal law by "forbidding" law enforcement agencies from communicating with federal immigration officials about transfers of detained individuals to federal custody. *Id.* ¶ 38. The Complaint says this "effectively requires federal immigration officers either to engage in difficult and dangerous efforts to re-arrest aliens" previously in New Jersey custody or "creates a situation where federal immigration officers may determine that it is not appropriate to transfer an alien" to state or local custody. *Id.* ¶ 31.

Defendants now move to dismiss the Complaint in its entirety.

## STANDARD OF REVIEW

When a defendant moves to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." *See Philips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). But this Court may not accept a plaintiff's "legal conclusions," which it must evaluate for itself. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### A. SECTION II.B.5 OF THE IMMIGRANT TRUST DIRECTIVE DOES NOT VIOLATE THE SUPREMACY CLAUSE.

The Federal Government argues Section II.B.5 violates the Supremacy Clause because it is preempted and violates the intergovernmental immunity doctrine. The Federal Government is wrong on both counts.

### A. Section II.B.5 Of The Immigrant Trust Directive Is Not Preempted.

The Federal Government has plenary authority in setting immigration policy for the Nation and in enforcing that policy. While no State can override or interfere with federal immigration law, every court to consider the issue has found that States can nevertheless make their own decisions regarding when to voluntarily participate in enforcement of federal immigration law. New Jersey's Immigrant Trust Directive fits comfortably within that regime for three reasons. First, no provision of the INA expressly preempts the Directive. Second, the INA also does not impliedly preempt

12

the Directive, and the two can easily coexist. Third, this position is confirmed by the canon of constitutional avoidance, because a reading of the INA that prevents States from declining to participate in the enforcement of federal immigration law violates the Tenth Amendment's anti-commandeering doctrine.

### i. *The INA Does Not Expressly Preempt Section II.B.5.*

Express preemption "arises when there is an explicit statutory command that state law be displaced." *St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the V.I.*, 218 F.3d 232, 238 (3d Cir. 2000). The only provision of the INA that potentially speaks to the Directive is Section 1373, which declares that a State may not restrict the communication of information "regarding the citizenship or immigration status, lawful or unlawful, of any individual" between "any government entity or official" and the Federal Government. 8 U.S.C. § 1373(a).[1] But the Directive allows for full compliance with Section 1373's terms. The Directive states that "[n]othing" in the policy "shall be construed to restrict, prohibit, or in any way prevent a state, county, or local law enforcement agency or official from ... [s]ending to, maintaining, or receiving from federal immigration authorities information regarding the citizenship

---

[1] Section 1644 also governs communications between state and local government entities and the Federal Government regarding someone's "immigration status." 8 U.S.C. § 1644. Because it uses the same language as Section 1373—and is narrower, because (unlike Section 1373) this provision does not mention "citizenship status"— this brief focuses only on Section 1373. If Section 1373 does not expressly preempt New Jersey law, *a fortiori* Section 1644 does not either.

13

or immigration status, lawful or unlawful, of any individual." Appx. A § II.C.10 (citing 8 U.S.C. §§ 1373 & 1644). Because New Jersey law does not do what Section 1373 prohibits, express preemption cannot apply.

To show the INA expressly preempts the Directive, the Federal Government will claim—as it has unsuccessfully done in other cases—that Section 1373 requires the sharing of *other* kinds of information, such as an immigrant's release date from jail or her address. But as courts unanimously have held, that position is incorrect. The statutory phrase "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" means what it says: "an individual's category of presence in the United States—*e.g.*, undocumented, refugee, lawful permanent resident, U.S. citizen, etc.—and whether or not an individual is a U.S. citizen, and if not, of what country." *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 333 (E.D. Pa. 2018), *aff'd in part & vacated in part on other grounds*, 916 F.3d 276 (3d Cir. 2019); *see also United States v. California*, 921 F.3d 865, 889 (9th Cir. 2019) (agreeing this "is naturally understood as a reference to a person's legal classification under federal law"), *cert. denied*, No. 19-532 (U.S. June 15, 2020). Indeed, when Congress used this phrase in another part of the INA, it gave only one example of such information: "knowledge that a particular alien is not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(A). By contrast, as a matter of plain English, dates that "an individual will be released from a [county jail] cannot be considered

14

'information regarding' his immigration status." *Philadelphia*, 309 F. Supp. 3d at 333; *see also Steinle v. San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019) (same).

The fact that Section 1373 refers to information "regarding" an individual's immigration status does not change the analysis. While the term "regarding" can at times "ha[ve] a broadening effect," *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018), the Supreme Court has cautioned that this term cannot be "taken to extend to the furthest stretch of its indeterminacy," *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *see also California*, 921 F.3d at 892 (same). The Federal Government's likely argument that the phrase is broad enough to encompass anything relating to federal removability or detention decisions reaches beyond the text, and in fact, the Federal Government has never provided a clear principle to limit its construction. After all, "the range of facts that might have some connection to federal removability or detention decisions is extraordinarily broad," including information like "vaccination history, education, financial resources, and [political] membership." *California*, 921 F.3d at 892 (citing 8 U.S.C. § 1182). An even broader set of facts can help authorities detain someone, including the addresses of the non-citizen's relatives. To the extent that the Federal Government denies that its interpretation sweeps in these types of information, it will have to explain why the statute nevertheless reaches a non-citizen's release date from jail; to the extent it agrees the INA sweeps so broadly, it will have to square its

view with the INA's language. It will be unable to do so, however, because as federal courts have repeatedly found, "[t]he phrase 'information regarding' includes only information relevant to *that* inquiry," *Philadelphia*, 309 F. Supp. 3d at 333 (emphasis added)—namely, the inquiry into someone's immigration status.

The INA's structure confirms what every court has found as a matter of text. Importantly, "Congress has used more expansive phrases in other provisions of Title 8 when intending to reach broader swaths of information." *California*, 921 F.3d at 892. Indeed, the INA requires all *federal* agencies to provide "[a]ny information in any records … as to the identity and location of aliens" to ICE, 8 U.S.C. § 1360(b), and calls on the Social Security Administrator to provide "information regarding the name and address" of undocumented individuals reporting employment earnings, *id.* § 1360(c). Congress used even broader language in another section, "mandating the inclusion of 'such other relevant information as the Attorney General shall require as an aid' to the creation of a central index of noncitizens entering the country." *California*, 921 F.3d at 892 (quoting 8 U.S.C. § 1360(a)). As these provisions show, Congress knew exactly how to refer to the sharing of a broader array of information relating to immigrants and their whereabouts, but it did not do so in enacting Section 1373. *See, e.g.*, *Steinle*, 919 F.3d at 1164 (explaining that "Congress certainly could have added explicit 'release date' wording to the statutes, but it did not").

16

As it has before, the Federal Government may respond that Section 1373(c)—which imposes requirements on information ICE must share with state officials—does not use "regarding," while Section 1373(a) does. The Federal Government has argued that this means Section 1373(a) must have wide-ranging scope and thus cover the information described above. But courts have consistently drawn precisely the opposite inference from this very distinction—namely, "the fact that subpart (c) only concerns itself with immigration status suggests, given § 1373's focus on reciprocal communication between states and the federal government, that immigration status is the extent of subpart (a)'s reach." *California*, 921 F.3d at 892. In light of the INA's overall structure, that is the only sensible conclusion. Had Congress really wanted to mandate a broad array of information sharing, it could have repeated the language from other parts of the INA, rather than copying the formulation of Section 1373(c) and adding the word "regarding." *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not … hide elephants in mouseholes"). The Federal Government's reading of Section 1373(a) thus cannot hold up.

  ii.  *The INA Does Not Otherwise Preempt Section II.B.5.*

Because the INA does not expressly preempt the provisions of Section II.B.5, the Federal Government can only argue that the INA *impliedly* preempts the State's decisions regarding its law enforcement officers' participation in civil immigration enforcement. The Federal Government relies on "conflict preemption," under which

a state law is preempted when it "stand[s] as an obstacle to the accomplishment and execution" of a federal statute. *Arizona*, 567 U.S. at 399. The Federal Government contends that the Directive unlawfully has "the purpose and effect of obstructing federal immigration enforcement" because Section II.B.5 "prohibits or restricts basic cooperation with federal officials." *Compl*. ¶¶ 3, 28. But because the INA does not compel state assistance in the enforcement of federal civil immigration law, a State's refusal to offer it cannot constitute obstruction of the INA's purpose.

The Federal Government fails to grasp the distinction between state laws that *obstruct* enforcement of federal laws, which are preempted, and laws that decline to provide *affirmative* assistance in federal enforcement efforts, which are not. Nothing in Section II.B.5 obstructs the enforcement of the INA. The Directive does not give anyone a right to remain in the United States, or limit who federal authorities can detain or where or when they can detain them. As the Seventh Circuit explained in an analogous matter, "nothing in this case involves any affirmative interference with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities." *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018), *vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018); *see also, e.g.*, *California*, 921 F.3d at 889 (recognizing the decision to refrain from aiding in federal immigration enforcement "is not the same as impeding").

18

Because Section II.B.5 simply reflects a choice as to when state and local law enforcement may affirmatively assist in the enforcement of civil immigration law by sharing information not specifically required by Section 1373(a), it falls comfortably within the State's police powers. As courts have consistently held, "the choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities," including the choice not to "inform[] federal authorities when persons are in their custody." *Chicago*, 888 F.3d at 282. Because a "state's ability to regulate its internal law enforcement activities is a quintessential police power," it is that "police power—not preemption" that a Court "must assume, unless *clearly superseded* by federal statute." *California*, 921 F.3d at 887 (emphasis added); *see also City of Chicago v. Barr*, 957 F.3d 772, 782 (7th Cir. 2020), *as amended by*, 2020 WL 3037242, at *6 (June 4, 2020) (same); *Parker v. Brown*, 317 U.S. 341, 351 (1943) ("In a dual system of government in which, under the Constitution, the states are sovereign ... an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.").

It follows, courts have unanimously held, that the Federal Government cannot provide any evidence—let alone clear evidence—that the INA was intended to strip the States of the power to decide when their officers should volunteer to assist in the enforcement of federal immigration laws. *See California*, 921 F.3d at 889 (holding

the INA "provides states and localities the option, not the requirement, of assisting federal immigration authorities"). That is unsurprising. "With the exception of § 1373(a)" (discussed above), the key portions of the INA "direct *federal* activities, not those of state or local governments." *Id.* at 887. For example, although Congress decided to allow federal agents to remove certain immigrants only after they have completed their criminal sentences (with a few specified exceptions), *see Compl*. ¶ 29 (citing 8 U.S.C. §§ 1226(c) & 1231(a)(4)), Sections 1226 and 1231 only impose duties on *federal* officials—to arrest and detain aliens, to do so promptly, and to do so after those aliens finish serving any criminal sentences.

Conversely, that means Sections 1226 and 1231 do not impose duties directly on state and local officials. *See California*, 921 F.3d at 887; *see also, e.g.*, *Arizona*, 567 U.S. at 410 (finding that "State officials *can* also assist the Federal Government by responding to requests for information about when an alien will be released from their custody" (emphasis added)). It is possible Congress "presume[ed] that states would conduct their law enforcement activities in concert with federal immigration efforts," but assumptions are not enough for a finding of preemption where Congress "opted not to codify its belief" in the plain text. *California*, 921 F.3d at 887. And the plain text is clear: the INA permits federal agents to ask state and local officials for advance notice of someone's release, but it does not require state and local officials to answer, let alone with the clarity necessary to override state police powers.

The fact that ICE might issue a "detainer" seeking the information covered by Section II.B.5 only confirms this analysis. *See Compl.* ¶ 20. As a matter of circuit precedent and federal regulations, an immigration detainer seeking personal data or release date information is merely a "request[]," 8 C.F.R. § 287.7(a), and responding is "permissive, not mandatory," *Galarza v. Szalczyk*, 745 F.3d 634, 642 n.9 (3d Cir. 2014); *see also id.* at 640 (noting "no U.S. Court of Appeals has ever described ICE detainers as anything but requests"); *id.* at 643 (holding that "settled constitutional law clearly establishes that [detainers] must be deemed requests," and not mandatory orders); *California*, 921 F.3d at 887 (same). The fact that States can ignore detainers seeking release-date information is powerful evidence that the INA does not require them to provide such information—and does not preempt orders that refuse to do so.

The above discussion demonstrates that no matter how important ICE might find this information now, "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas v. Garcia*, 140 S. Ct. 791, 807 (2020) (quoting U.S. Const. art. VI, cl. 2). And the INA neither requires state and local officials to voluntarily share release dates nor preempts the Directive.

   iii. *The Canon of Constitutional Avoidance Bolsters The Conclusion That The INA Does Not Preempt The Directive.*

The canon of constitutional avoidance reflects the longstanding and "cardinal principle of statutory interpretation that when an Act of Congress raises a serious doubt as to its constitutionality, courts will first ascertain whether a construction of

21

the statute is fairly possible by which the question may be avoided." *Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208, 223 (3d Cir. 2018). That rule is especially important when, as here, the case presents issues of federalism, because courts also have to "be certain of Congress's intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014). The Federal Government's interpretation of the INA would require state and local officials to assist the Federal Government in federal immigration enforcement, or at the very least bar the State from regulating state and local officials' decisions to do so. Because that interpretation would plainly contravene the Tenth Amendment, the Court should not adopt it.

Under the Tenth Amendment, the United States "may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). That principle, known as the anti-commandeering rule, is straightforward: because the Constitution "'confers upon Congress the power to regulate individuals, not States,'" Congress lacks "the power to issue direct orders to governments of the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018) (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). That is true no matter whether Congress seeks to tell state officials to "enact" a certain statute or take a specific action, or to "refrain" from enacting certain laws. *Id.* at 1478. It follows that States have the power to "decline

to administer [a] federal program." *New York*, 505 U.S. at 177; *see also Printz*, 521 U.S. at 909-10 (noting States may "refuse[] to comply with [a] request" to administer federal law). *Printz* is illustrative. In that case, Congress passed a law requiring local law enforcement officers to perform background checks on gun buyers. The Court invalidated the federal law on the basis that it "command[ed] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." 521 U.S. at 935. States thus retain the "prerogative" to refuse a role in implementing "Congress's desired policy, 'not merely in theory but in fact.'" *Nat'l Fed. of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 581 (2012).[2]

The central theme of the anti-commandeering cases—that the States have no obligation to assist the Federal Government with enforcing federal law—advances a number of important goals. Most obviously, the States' ability to opt out of federal programs "serves as 'one of the Constitution's structural protections of liberty'" by stopping Congress from conscripting thousands of state officers into its regulatory machinery. *Murphy*, 138 S. Ct. at 1461 (quoting *Printz*, 521 U.S. at 921). The rule "promotes political accountability" by enabling residents to know "who to credit or blame" for any particular governmental action. *Id.* at 1477; *see also New York*, 505

---

[2] Of course, Congress could give States the option of helping administer federal law. *See Murphy*, 138 S. Ct. at 1479. Congress can even offer funds to incentivize States to implement its federal policy. *See New York*, 505 U.S. at 167. Such approaches all comply with the Tenth Amendment because "the residents of the State retain the ultimate decision" as to whether they will participate. *Id.* at 168.

U.S. at 169 (same). And it "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1461; *see also Printz*, 521 U.S. at 922 (noting that Congress cannot "impress into its service—and at no cost to itself—the police officers of the 50 States"). If Congress wants to enforce its policy, Congress (not the States) must take ownership, and Congress (not the States) must pay the costs.

As a threshold matter, an interpretation of the INA that *requires* state and local officials to aid the Federal Government in enforcing federal immigration laws would violate the Tenth Amendment. That interpretation would prevent these officials from "refus[ing] to comply with [a] request" to administer a federal law, *Printz*, 521 U.S. at 909-10, and it would instead "command" state officers to participate, *id.* at 935. Read in that way, the INA would necessarily undermine political accountability and "shift[] a portion of immigration enforcement costs onto the States." *San Francisco v. Sessions*, 349 F. Supp. 3d 924, 951-52 (N.D. Cal. 2018). It follows, the Third Circuit has held, that "immigration officials may not compel state and local agencies to expend funds and resources to effectuate a federal regulatory scheme." *Galarza*, 745 F.3d at 644; *see also California*, 921 F.3d at 889 (same). In other words, in order for the INA to be constitutional, state and local officials must have discretion not to participate in federal civil immigration enforcement.

Because state and local officers have discretion not to participate in federal immigration enforcement, the only remaining question is whether the State can adopt

rules governing how its officers must exercise that discretion, or whether Congress can order a State to refrain from doing so. After the Court's decision in *Murphy*, the answer is clear: Congress lacks "the power to issue direct orders to governments of the States," including direct orders to "refrain" from enacting certain kinds of laws. 138 S. Ct. at 1476. And that is what the Federal Government's interpretation of the INA represents: a direct order that a State "not prohibit, or in any way restrict, any government entity or official" from assisting in immigration enforcement in a variety of ways. 8 U.S.C. § 1373(a). Just as the Professional and Amateur Sports Protection Act—held unconstitutional in *Murphy*—made it "unlawful for a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law" gambling on sports, 28 U.S.C. § 3702(1), so too a prohibition on policies that limit voluntary law enforcement assistance in immigration operations is a "command to the States" that "the anticommandeering rule does not allow." *Murphy*, 138 S. Ct. at 1481.

In truth, the Federal Government's construction of the INA offends the Tenth Amendment more than did the law at issue in *Murphy*. Not only would its approach impermissibly order the State to refrain from enacting certain policies, but it would allow the Federal Government to dictate how decision-making power is distributed within the State—by reassigning the issue of whether to provide civil immigration assistance away from the State's chief law enforcement officer and to line officers or local governments. The Supreme Court, however, has cast doubt on federal laws

that "interpos[e] federal authority between a State and its municipal subdivisions, which … are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." *Nixon v. Mo. Mun. League*, 541 U.S. 125, 140 (2004). That is why the Federal Government's approach also runs afoul of the Supreme Court's "working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power." *Id.*

It is thus no surprise that, after *Murphy*, nearly every court to consider the issue has agreed that the INA cannot prevent state governments from issuing rules that govern their law enforcement officers' voluntary participation in federal civil immigration initiatives. *See, e.g., California*, 921 F.3d at 890 (holding that "the choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal"); *Philadelphia*, 309 F. Supp. 3d at 330 (same); *San Francisco*, 349 F. Supp. 3d at 951-52 (same); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 871–72 (N.D. Ill. 2018) (same). *California* is especially relevant. In that case, the Ninth Circuit upheld a state law limiting the assistance that state and local law enforcement could provide to federal civil immigration authorities. And the panel did so based on reasoning that applies powerfully here: if state and local officers can make a "lawful decision not to assist

26

federal authorities"—as they can—then that decision cannot be "made unlawful when it is codified as state law" without violating *Murphy* and anti-commandeering principles. *California*, 921 F.3d at 890; *see also, e.g., Chicago v. Barr*, 957 F.3d at 799 (such "restriction of the state or local government would constitute direction or control over the communications by the state or local police force").

Nor do any of the possible exceptions to the anti-commandeering rule apply. The Federal Government has argued before, and will likely argue again, that the INA is a straightforward preemption provision applicable to everyone (state and private actors alike), and is therefore not an unlawful attempt to commandeer the States. But as in *Murphy*, that claim gets it nowhere. Section 1373 is "not a preemption provision because there is no way in which this provision can be understood as a regulation of private actors." *Murphy*, 138 S. Ct. at 1481. Instead, it speaks only to the conduct of "a Federal, State, or local government entity or official." 8 U.S.C. § 1373(a). The law "does not confer any federal rights on private actors," and it does not "impose any federal restrictions on private actors." *Murphy*, 138 S. Ct. at 1481. As a result, "[g]iven the[] plain language," Section 1373(a) cannot "be best read as regulating private actors." *Philadelphia*, 309 F. Supp. 3d at 330; *see also, e.g.*, *California*, 921 F.3d at 890 (adding that "it is the state's responsibility to help enforce federal law, and not conduct engaged in by both state and private actors, that is at issue"). That

Section 1373 regulates how states share information *about* private parties does not mean it regulates the private parties themselves. *See California*, 921 F.3d at 889.

The Federal Government will also argue, in the alternative, that the INA fits into a carve-out to the anti-commandeering rule for statutes facilitating the provision of information to federal officials. But courts to directly consider the question have rejected that argument for several reasons. First, the Court has never actually found such an exception to exist. *See Philadelphia*, 309 F. Supp. 3d at 330-31; *Oregon v. Trump*, 406 F. Supp. 3d 940, 973 (D. Or. 2019). And there are good reasons to think it does not. For one, information sharing—like any form of assistance—can involve significant regulatory burdens, which the Federal Government cannot properly shift to state and local law enforcement. *See, e.g.*, *Chicago v. Sessions*, 321 F. Supp. 3d at 866-73. For another, information sharing can undermine "political accountability" by, *e.g.,* leading the affected communities to believe the States are playing a role in federal immigration enforcement and thus holding the States responsible for it. *See Murphy*, 138 S. Ct. at 1477. Absent explicit evidence from the Supreme Court of a purported information-sharing exception, this Court should not create one.

Second, this Court need not conclusively resolve whether such an exception to Tenth Amendment rules exists because the exception would not save the INA in any event. That is because the INA does more than require provision of information; it specifically prohibits States from enacting laws that restrict the provision of certain

28

information, running headlong into *Murphy*'s holding that "Congress cannot issue direct orders to state legislatures." 138 S. Ct. at 1478; *see also, e.g.*, *Oregon*, 406 F. Supp. 3d at 973 (noting that the INA, as read by the Federal Government, would include "more than just information-sharing provisions" and instead would "prevent state and local policymakers from enacting a wide range of information-governance rules and force them to stand aside and allow the federal government to conscript the time and cooperation of local employees"); *Chicago v. Sessions*, 321 F. Supp. 3d at 872 (same); *San Francisco*, 349 F. Supp. 3d at 953 (same).

Only one court has even gestured at a different position after *Murphy*, but that opinion is distinguishable. Earlier this year, the Second Circuit faced a challenge to conditions the Department of Justice placed on the Edward Byrne Memorial Justice Assistance Grant ("Byrne-JAG") Program—which grants funding to state and local law enforcement. *See New York v. Dep't of Justice*, 951 F.3d 84, 90 (2d Cir. 2020). These conditions required recipients to, *inter alia*, "provide federal authorities, upon request, with the release dates of incarcerated illegal aliens." *Id.* The question before the Court was whether those funding restrictions were consistent with federal laws and with the Tenth Amendment. The Second Circuit declined to resolve whether the INA could be used to preempt state laws—as the Federal Government seeks to do in this case—"because § 1373's constitutionality is properly assessed [in that case] not on the face of the statute, but as applied to clarify *a federal funding requirement*."

*Id.* at 111 (emphasis added); *see also id.* (noting the panel would "not here decide" if Section 1373 was constitutional outside of the funding-restriction context).

To be sure, the Second Circuit did in dicta opine that a district court erred in holding Section 1373 invalid because the district court failed to identify any power "reserved to the States" that Section 1373 infringes. *Id.* at 113-14; *see id.* (positing that States may not have the "reserved power" to prohibit federal-state information sharing). But that does not control for three reasons. First, as noted, the panel found that while it had some "doubt" as to the "facial unconstitutionality" of Section 1373, it would "not ... pursue the point further" because that case was only about funding restrictions. *Id.* at 114. Second, the panel recognized that every other circuit to review the issue had disagreed, including in other cases considering funding restrictions, let alone ones involving preemption. Finally, even under that opinion, New Jersey has identified the "reserved power" at issue—to regulate internal law enforcement activities, an important power "reserved to the States." *United States v. Morrison*, 529 U.S. 598, 618 (2000); *see also Nixon*, 541 U.S. at 140.

The Federal Government's reading of the INA runs headlong into the Tenth Amendment. As a result, this Court can and should avoid these questions by instead ruling that Section II.B.5 does not preempt the Immigrant Trust Directive.

B. Section II.B.5 Of The Immigrant Trust Directive Does Not Violate The Intergovernmental Immunity Doctrine.

The Federal Government's second challenge to Section II.B.5 likewise falls short. The doctrine of intergovernmental immunity bars States from "regulat[ing] the United States directly or discriminat[ing] against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.); *see also Treasurer of N.J. v. U.S. Dep't of the Treas.*, 684 F.3d 382, 410 (3d Cir. 2012). The Supreme Court has taken "a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *North Dakota*, 495 U.S. at 435. The doctrine is "not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment." *California*, 921 F.3d at 881. Rather, a State impermissibly discriminates only when it "treats someone else better than it treats" the Federal Government, *Washington v. United States*, 460 U.S. 536, 544-45 (1983), and even then it may do so if there are "significant differences between the two classes" that explain the distinct treatment, *Davis v. Mich. Dep't of the Treas.*, 489 U.S. 803, 816 (1989). Contrary to the assertion that Section II.B.5 "violate[s] the Supremacy Clause by … discriminating against federal immigration authorities," *Compl.* ¶¶ 40-41, the Directive does no such thing.

31

The fundamental problem for the Federal Government is that Section II.B.5 does not actually disfavor any analogous federal and state activities. Rather, the goal of the Directive is to reduce entanglement between civil immigration activities and criminal law enforcement. The Complaint itself recognizes as much, alleging "[t]he Directive's restrictions discriminate against federal immigration authorities because *they do not apply to other federal authorities*, state agencies or, as applicable, the general public." *Compl.* ¶ 33 (emphasis added). But drawing a distinction between immigration and criminal law enforcement does not demonstrate any discrimination against federal officials simply because the Federal Government alone is responsible for enforcement of the former. And even if it did, New Jersey identified substantial reasons to believe that participation in civil immigration efforts would undermine law enforcement officers' ability to do their job in a way quite unlike other activities. *See* Appx. A at 1 (introductory clauses) (finding, based on extensive literature, that immigrants are "less likely to report a crime if they fear that the responding officer will turn them over to immigration authorities"). Whether the Federal Government agrees with that policy is beside the point; all that matters is that it reflects a response by a State's Chief Law Enforcement Officer to the "significant differences" between civil immigration and criminal enforcement—especially as it relates to building trust with New Jersey's immigrant communities—and is therefore not a form of invidious discrimination against the Federal Government.

Although the above is enough to foreclose the intergovernmental immunity argument, the Tenth Amendment once again has a role to play. The entire question here is whether a State gets to decide whether to participate in a federal enforcement program, immigration or otherwise. As the Ninth Circuit explained in rejecting the same challenge to an analogous state law, any "finding that [the Directive] violates the doctrine of intergovernmental immunity would imply that [States] *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 891; *see also United States v. California*, 314 F. Supp. 3d 1077, 1110 (E.D. Cal. 2018) (district court opinion) (noting the Federal Government has not identified any applications of the doctrine "involv[ing] an analogous regulation"). At bottom, this doctrine—like preemption— cannot foreclose a State from choosing when to participate in an enforcement effort. *See Davis*, 489 U.S. at 814 (holding that the intergovernmental immunity doctrine is "based on the need to protect *each sovereign's* governmental operations from undue interference by the other" (emphasis added)). It thus does not stop New Jersey from disentangling civil immigration and criminal enforcement.

## B. SECTION II.B.5 OF THE IMMIGRANT TRUST DIRECTIVE DOES NOT VIOLATE THE SUPREMACY CLAUSE.

The Federal Government's challenge to Section VI.A of the Immigrant Trust Directive also falls short as a matter of law. As explained above, Section VI.A lays

33

out a "notification" regime in which New Jersey's state and local law enforcement officers are required to notify detained individuals when federal civil immigration authorities seek: (1) to interview the detainee; (2) to receive notice of the detainee's upcoming release from custody; and (3) to have state and local law enforcement officers continue to detain the detainee past the time they would otherwise be eligible for release. Appx. A § VI.A. It also establishes that these officers will provide detainees with copies of any related documents provided by those federal authorities. *Id.* Just as with Section II.B.5, this provision of the Immigrant Trust Directive is neither preempted nor in violation of the intergovernmental immunity doctrine.

There are a number of reasons that the Directive includes this provision—all linked to building trust with New Jersey's immigrant communities. Importantly, all three of the notification requirements connect to other substantive requirements of the Directive. The first connects to the rule that New Jersey law enforcement officers provide immigration authorities "access to a detained individual for an interview" only when that individual has consented. Appx. A § II.B.4. The Federal Government has not challenged the validity of that requirement, and notifying the detainee of an interview request is a necessary part of obtaining such consent.

Regarding the second and third provisions, the Directive lays out a number of times in which New Jersey law enforcement can "[p]rovid[e] notice of a detained individual's upcoming release from custody" and can "[c]ontinu[e] the detention of

an individual past the time he or she would otherwise be eligible for release from custody based solely on a civil immigration detainer request." Appx. A §§ II.B.5-6. Law enforcement may do so, inter alia, whenever someone has been charged with— or ever convicted of—a range of violent of serious offenses, as well as anytime there is a final order of removal against them. *Id.* But when they do so, of course, there is a risk a State will be blamed for what the Federal Government asked of it—and will lose the trust it had built with immigrants. The Directive thus ensures awareness that the Federal Government is the one responsible for seeking that immigrant's transfer, or for their being held beyond the scheduled time of release. Similarly, if a local law enforcement officer is allowed (but not required) by the Directive to share someone's release-date information or continue their detention, the notification provisions help ensure that the officer can evaluate considerations raised by the immigrant before doing so.[3] The notification provision thus effectuates the substantive rules.[4]

---

[3] Among other benefits, this Directive would help to ensure law enforcement does not turn a detainee over to immigration authorities in the case of a mistaken identity or record. *See, e.g.*, St. John & Rubin, "ICE Held an American Man in Custody for 1,273 Days," *L.A. Times* (Apr. 27, 2018) (recounting statistics and examples).

[4] Of course, this does mean that there will be times that officers inform immigrants of the requests from immigration authorities even when the requests must be denied. But that simply reflects the need for categorical and clear instructions in this context, so that law enforcement officers know what steps to take anytime they receive such a request, without having to make subjective case-by-case determinations.

This notification provision—which exclusively governs the relationship and communications between a local law enforcement agency and its detainees—cannot be preempted. As a threshold matter, the Federal Government does not ever appear to allege that the INA itself would bar an individual officer from telling any detainee that civil immigration authorities seek to interview her, find out her release date, or have her detained past the time she is eligible for release. That makes sense: with the exception of Section 1373(a), which has no bearing on notification, the INA directs *federal* activities and not the activities of state or local law enforcement officers. So there are no prohibitions of the INA this law enforcement officer would be violating if he voluntarily provided the notifications Section VI.A of the Directive calls for, and no consequences under federal law for doing so. Indeed, DHS's detainer forms state that the "alien **must be served with a copy of this form** for the detainer to take effect." Department of Homeland Security, Immigration Detainer - Notice of Action, available at https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf (last accessed June 17, 2020) (emphasis in original).

The Federal Government erroneously believes that this somehow changes if a State's Chief Law Enforcement Officer establishes a uniform policy to govern when officers provide notifications. That argument has significant obstacles to overcome. For one, there is no traditional conflict preemption here; it is obviously possible for someone to comply with the INA (which sets the duties for federal civil immigration

authorities) and the Directive (which speaks only to notifications by New Jersey state and local law enforcement) at the same time. So absent express preemption from the text, and absent a conflict, the Federal Government relies entirely on the doctrine of implied preemption—alleging the Directive's uniform notification rule "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), by "thwarting DHS's ability to take [incarcerated] aliens into custody." *Compl.* ¶¶ 14, 32.

But the doctrine of implied preemption on which the Federal Government is relying "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011). To the contrary, a "high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act"—and finding preemption requires evidence from the statute itself, as "it is Congress rather than the courts that pre-empts state law." *Id.* In other words, and contrary to the Federal Government's position, it cannot be enough that the Immigrant Trust Directive *can*, as a practical consequence in some cases, put individuals on notice that ICE might seek their detention. *Compare, e.g.*, *Compl.* ¶ 18 (arguing that "Federal law *generally contemplates* that such aliens will serve their state or local criminal sentences before being subject to removal, but then will be taken into federal custody upon the expiration of their state prison terms" (emphasis added)), *with Kansas*, 140 S. Ct. at

807 (noting that "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption").

The Federal Government cannot point to any indication that in enacting the INA, Congress intended to curtail States' power over their internal operations of jails and prisons by limiting communications with inmates in state custody. The Federal Government relies on Section 1226 and 1231, but the Federal Government does not (and cannot) claim that either proscribes States from providing these three categories of information to an immigrant. In fact, they say nothing regarding this information. Instead, the Federal Government argues the Directive's Section VI.A is inconsistent with the gist of the INA, *Compl.* ¶ 29 (citing 8 U.S.C. § 1226(c); § 1231(a)(4))—a theory so broad that it would trump any State action the Federal Government deems inconsistent with their goals of detention and deportation after release from custody. The Federal Government attempts to justify this interpretation as being based in the need for "cooperation" between federal, state, and local governments. *See Compl.* ¶¶ 18, 20, 22, 28, 35. But looking at what a law might generally contemplate, and what cooperation might have been envisioned, is the definition of an impermissible "freewheeling judicial inquiry." *Chamber of Commerce*, 563 U.S. at 607; *see also California*, 921 F.3d at 887 (noting that while Congress might have "presume[ed] that states would conduct their law enforcement activities in concert with federal

38

immigration efforts," such assumptions cannot be enough for a preemption finding where Congress "opted not to codify its belief" in the text of the INA).

The Federal Government's reading of the INA to preempt the Immigrant Trust Directive's uniform notification rules also violates the anti-commandeering rule. To reach its result, the Federal Government must espouse one (or both) of two theories: (1) local law enforcement officers could choose for themselves whether to notify a detainee of the immigration authority's request, but the State cannot establish rules requiring them to do so; and/or (2) local law enforcement officers could never inform a detainee of these requests. If the Federal Government makes the former argument, it runs afoul of the rule that "federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power." *Nixon*, 541 U.S. at 140. New Jersey adopted a model in which the Attorney General is the State's Chief Law Enforcement Officer, able to set policies for every law enforcement agency and officer. The Federal Government cannot trammel on that arrangement by barring a State from adopting uniform rules for notification, forcing that question to be resolved agency-by-agency or officer-by-officer. And if the Federal Government adopts the latter view—that *no* officer may inform an immigrant detainee of federal requests—then it is essentially demanding that officers make inmates available for interviews, turn over their release dates, and hold them

beyond those dates without allowing them to share the relevant, underlying requests. That conflicts with *Murphy*, which emphasized clear federal-state lines "promote[] political accountability" by enabling residents to know "who to credit or blame" for any particular governmental action. 138 S. Ct. at 1461.

The Federal Government's intergovernmental immunity challenge to Section VI.A gets it no further. The provision obviously does not "regulate the United States directly," *North Dakota*, 495 U.S. at 435, because it does not regulate the United States at all. To the contrary, it merely sets forth a specific procedure for notifications that the State alone performs. The burden rests on state and local law enforcement to engage in the required notification. Nor does this section "discriminate against the Federal Government." *Id.* As with its challenge to Section II.B.5 of the Immigrant Trust Directive, the Federal Government fails to establish which similarly-situated parties—*i.e.*, those engaged in immigration enforcement—are favored over federal immigration authorities with respect to Section VI.A. The mere reference to federal immigration authorities in the Directive is not enough to transform it into a law that violates intergovernmental immunity. *California*, 921 F.3d at 881.

## **CONCLUSION**

This Court should dismiss the Complaint in its entirety.

Respectfully submitted,

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY


By:   /s/ Daniel M. Vannella
        Daniel M. Vannella
        Assistant Attorney General (015922007)

Dated: June 18, 2020