**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>THE STATE OF NEW JERSEY; PHILIP D. MURPHY, in his Official Capacity as Governor of New Jersey; GURBIR S. GREWAL, in his Official Capacity as Attorney General of New Jersey,<br><br>    Defendants. | Hon. Freda L. Wolfson, U.S.D.J.<br>Hon. Tonianne J. Bongiovanni, U.S.M.J.<br><br>Docket No. 3:20-CV-1364-FLW-TJB<br><br>**<u>CIVIL ACTION</u>**<br><br>**(ELECTRONICALLY FILED)**<br><br>Motion Return Date: September 7, 2020 |

DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFF'S COMPLAINT IN LIEU OF AN
ANSWER

Jeremy M. Feigenbaum
State Solicitor

Daniel M. Vannella
Michael C. Walters
Assistant Attorneys General
    Of Counsel and on the Brief

Bryan Edward Lucas
Michael R. Sarno
Marie Soueid
Emily K. Wanger
Deputy Attorneys General
    On the Brief

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW
    JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 116
Trenton, New Jersey 08625
*Attorney for Defendants, the State of New Jersey, Philip D. Murphy, and Gurbir S. Grewal*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..........................................................................1

ARGUMENT ...............................................................................................3

I.   SECTION II.B.5 OF THE IMMIGRANT TRUST DIRECTIVE
     DOES NOT VIOLATE THE SUPREMACY CLAUSE ...............................3

     A.   Section II.B.5 Of The Immigrant Trust Directive Is Not
          Preempted.......................................................................................3

               i.   *Section II.B.5 Is Not Conflict Preempted* ...................................3

               ii.  *The Canon Of Constitutional Avoidance Confirms
                    That The INA Does Not Preempt This Section* ..........................8

     B.   Section II.B.5 Of The Immigrant Trust Directive Does Not
          Violate Principles Of Intergovernmental Immunity ..........................11

II.  SECTION VI.A OF THE IMMIGRANT TRUST DIRECTIVE
     DOES NOT VIOLATE THE SUPREMACY CLAUSE .............................15

CONCLUSION ........................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States*,
567 U.S. 387 (2012)..................................................................................6, 7

*Chamber of Commerce v. Whiting*,
563 U.S. 582 (2011)......................................................................................6

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993)....................................................................................13

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ........................................................................5

*City of Phila. v. Sessions*,
309 F. Supp. 3d 289 (E.D. Pa. 2018).............................................................4

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989)....................................................................................14

*Galarza v. Szalczyk*,
745 F.3d 634 (3d Cir. 2014) ..........................................................................6

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
138 S. Ct. 1461 (2018)......................................................................9, 10, 11

*New York v. United States*,
505 U.S. 144 (1992)......................................................................................9

*Nixon v. Mo. Mun. League*,
541 U.S. 125 (2004)....................................................................................18

*North Dakota v. United States*,
495 U.S. 423 (1990)..............................................................................12, 13

*County of Ocean v. Grewal*,
--- F. Supp. 3d ---, 2020 WL 4345317 (D.N.J. July 29, 2020)...................*passim*

ii

*Printz v. United States*,
521 U.S. 898 (1997).................................................................................9

*Reno v. Condon*,
528 U.S. 141 (2000).................................................................................4

*United States v. California* (*California II*),
921 F.3d 865 (9th Cir. 2019) ...........................................................*passim*

*United States v. California* (*California I*),
314 F. Supp. 3d 1077 (E.D. Cal. 2018) ...........................................12, 13, 14, 17

*Wis. Dep't of Indus., Labor & Human Rels. v. Gould Inc.*,
475 U.S. 282 (1986).................................................................................7

**Statutes**

8 U.S.C. § 1226..................................................................................10, 16

8 U.S.C. § 1226(a) .....................................................................................10

8 U.S.C. § 1226(c) .....................................................................................10

8 U.S.C. § 1231 .......................................................................................5, 10

8 U.S.C. § 1231(a) .....................................................................................10

8 U.S.C. § 1231(a)(1)..................................................................................16

8 U.S.C. § 1236...........................................................................................5

8 U.S.C. § 1373...........................................................................................4

8 U.S.C. § 1373(a) .......................................................................................4

**Other Authorities**

U.S. Const. amend. X...........................................................................*passim*

## **PRELIMINARY STATEMENT**

This Court would be forgiven for feeling a sense of déjà vu. After all, just last month, it already correctly resolved the vast majority of the legal issues that gave rise to the Federal Government's Complaint—and did so in favor of the State. In *County of Ocean v. Grewal*, this Court considered a challenge by two counties to the Immigrant Trust Directive ("ITD"), and upheld Section II.B.5 of that Directive against that attack. *See* --- F. Supp. 3d ---, 2020 WL 4345317 (D.N.J. July 29, 2020) ("*Ocean County*"). In line with every other court to consider the question, this Court recognized that nothing in the Immigration and Nationality Act ("INA") preempted the Directive's limits on the participation of state and local law enforcement officers in civil immigration operations, including its careful limits on when those officers could refer residents for removal by sharing their personal information with civil immigration authorities. In reaching that conclusion, this Court rejected arguments that had been advanced by both counties and by the United States itself.

Undeterred, the Federal Government continues to press the same arguments challenging Section II.B.5, urging this Court to give conflict preemption a second look. But *Ocean County* rightly rejected this argument because the INA imposes no duties on States to coordinate with federal immigration authorities. Even if Congress assumed cooperation would take place, this Court correctly found that assumptions are not enough to tie the States' hands. Although the Federal Government highlights

1

that its complaint alleges with more specificity the ways that the lack of cooperation will require immigration officers to spend more resources to perform their jobs, the problem in *Ocean County* was not a lack of specificity in the Complaints; it was that this *kind* of claim does not demonstrate preemption as a matter of law. So while the United States may wish to have New Jersey's officers at its beck and call, the INA does not demand that result, and the Tenth Amendment prohibits it.

The Federal Government's argument that the same provision also violates the intergovernmental immunity doctrine once again rehashes ground covered in *Ocean County*. Intergovernmental immunity serves to ensure that states do not discriminate against U.S. agencies in favor of "similarly situated" government bodies. Although the Federal Government argues that New Jersey continues to collaborate with state and local criminal law enforcement, it misses the point: under the ITD, New Jersey can continue to collaborate with federal criminal law enforcement in the same way. Instead, New Jersey has simply drawn a line between criminal law enforcement and civil immigration operations—a decision that reflects a sensible policy response to the differences between these activities, not invidious discrimination. And were the rule otherwise, the result would again contravene the Tenth Amendment.

Finally, while this case does present a claim not addressed in *Ocean County*— the challenge to Section VI.A of the Directive—that claim fails for many of the same reasons that undermined the challenge to Section II.B.5. As before, preemption does

2

not apply because nothing in the INA limits whether and when States can notify their detainees of any detainer requests, and no statutory provision even vaguely addresses the issue. Instead, the Federal Government's theory of preemption is again too broad, arguing that *any* state rule is preempted if it could result in federal civil immigration agents having to spend more resources doing their job. The same is true for its claim that Section VI.A violates the intergovernmental immunity doctrine, which yet again overlooks that New Jersey is not discriminating against any similarly situated federal agencies, but is instead distinguishing civil immigration operations and criminal law enforcement—a policy choice it remains free to make.

The ITD is, at its core, a constitutional exercise of the State's police powers to increase trust between law enforcement officers and the communities they serve. As in *Ocean County*, the Complaint must be dismissed.

## ARGUMENT

**I.     SECTION II.B.5 OF THE IMMIGRANT TRUST DIRECTIVE DOES NOT VIOLATE THE SUPREMACY CLAUSE.**

A.     Section II.B.5 Of The Immigrant Trust Directive Is Not Preempted.

i.     *Section II.B.5 Is Not Conflict Preempted.*

This Court already rejected an analogous challenge to Section II.B.5—one in which the Federal Government filed a Statement of Interest, raising the same issues it presses here. As this Court found, the United States has a high bar to clear, because "courts should assume that the historic police powers of the States are not superseded

3

unless that was the clear and manifest purpose of Congress." *Ocean County*, 2020 WL 4345317, *15 (citation omitted). Applying that test, this Court rightly found nothing in the INA "suggests that Congress impliedly mandated that state and local governments would act in accordance with those statutes." *Id.* at *16. This Court's decision was in line with the only other court to consider the issue, *see United States v. California* (*California II*), 921 F.3d 865 (9th Cir. 2019), and nothing in the Federal Government's latest brief calls for a different result. To the contrary, its Opposition Brief commits three errors: it fails to identify support in the actual text of the INA, it misunderstands the precedents, and it does not distinguish *Ocean County*.[1]

First, the Federal Government fails to identify any support in the INA for its

---

[1] Although the Federal Government also pled an express-preemption claim, it now recognizes that "the Court rejected" its view, and thus simply "reasserts its express-preemption arguments here for the Court's reconsideration and to preserve them for any appeal." Opp. Br. 2. Its arguments do not come close to establishing any need for this Court to revisit its reading of Section 1373, which, as this Court recognized, is in line with every court to squarely consider the question. *See Ocean County*, 2020 WL 4345317, *10-13 (citing cases). The Federal Government's textual argument relies solely on the fact that Section 1373 speaks of sharing information "regarding" an individual's immigration status, but it has no answer to the fact that its overbroad reading of that single word "would impermissibly expand the scope of these statutes to sweep in *any* information, including personal identifying data, concerning an alien in the United States." *Id.* at *12. It next resorts to legislative history, *see* Opp. Br. 27, but such history plays no role whenever the text is clear, and in any event, such materials do not support its sweeping arguments. *See* MTD Br. 3-6, 14-16. Finally, it relitigates the import of *Reno v. Condon*, 528 U.S. 141 (2000), but unlike the law at issue in *Reno*, Section 1373(a) does "not simply require disclosure of information, but instead 'directly tell[s] states and state actors that they must refrain from enacting certain state laws.'" *Ocean County*, 2020 WL 4345317, *14 n.21 (quoting *City of Phila. v. Sessions*, 309 F. Supp. 3d 289, 330 (E.D. Pa. 2018)).

view that Section II.B.5 is preempted. According to its brief, because the INA allows *federal* officials to assume custody of aliens after they complete criminal sentences, Congress must have "plainly contemplate[d] coordination between federal and state officials." Opp. Br. 13 (citing 8 U.S.C. §§ 1231, 1236); *see also id.* (suggesting these statutes "underscore this congressional expectation"). But mere assumptions are not enough: "even if Congress had every expectation that the States would comply with these sections, and opted not to codify its belief based on the presumption that states would conduct their law enforcement activities in concert with federal immigration efforts, it is a state's historic police power—not preemption—that we must assume, unless clearly superseded by federal statute." *Ocean County*, 2020 WL 4345317, *16 (citation omitted); *see also id.* (noting sections 1231(a) and 1226, which "impose obligations solely on the federal government," impose "no duty [on states] to assist the federal government with carrying out those obligations"); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (noting INA does not "prevent states from regulating *whether* their localities cooperate in immigration enforcement").

The Federal Government's brief is a perfect example of why courts demand evidence in the statutory text, rather than legislative assumptions: under the latter, there really is no stopping point to preemption. To its credit, the United States makes clear how far its approach would go, reading the INA to preempt any order making it harder for federal civil immigration authorities "to assume custody of unlawfully

5

present aliens in the manner Congress intended." Opp. Br. 14. But preemption "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted), which is why this Court already explained that "[w]hile it may very well be easier for federal law enforcement to effect removals if it has states' assistance," the INA "place[d] the burden of complying with the INA on the federal government, not state and local authorities," *Ocean County*, 2020 WL 4345317, *17. Simply put, as this Court correctly held, "the fact that the federal government may, without the cooperation of local law enforcement agencies, expend extra efforts and resources to apprehend aliens who are subject to removal, does not create the kind of 'direct' obstacle necessary to trigger conflict preemption," or else it would always be able to "strong arm the State into doing its own bidding." *Id.*[2]

That explanation leads inexorably to the Federal Government's second error in this case—it misunderstands relevant case law. In the Opposition Brief's telling, this case should be resolved by *Arizona v. United States*, 567 U.S. 387 (2012). In *Arizona*, the Supreme Court held that state laws dictating when individuals can be arrested for suspected immigration law violations and authorizing their state officials

---

[2] Notwithstanding the Federal Government's protestations to the contrary, *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014), offers evidence in support of this position. According to *Galarza*, state officers are not required to provide information covered by Section II.B.5, even when they receive a detainer requesting it. *Id*. at 640-41. If officers have such discretion, it follows that the State can tell them how to use it.

6

to prosecute federal immigration-related offenses obstructed federal authority over immigration policy. *See id.* at 400-10. That is no surprise: those laws sought to alter substantive federal immigration law by "interfer[ing] with the careful balance struck by Congress" in designing immigration policy, including when *not* to prosecute an offense. *Id.* at 406. The ITD could hardly be more different. It says nothing as to who the United States can detain—or when and where it can detain them. Rather, it "merely defin[es] the contours of New Jersey's and its localities' involvement in the enforcement of federal civil immigration law," and does not "encroach onto the regulation of immigration." *Ocean County*, 2020 WL 4345317, *17; *California II*, 921 F.3d at 889 & n.14 (same). As this Court held, there is a difference between seeking to prevent the Federal Government from doing its job, and simply declining to help. *See* MTD Br. 20. *Arizona* in no way addressed the latter.[3]

Finally, as the above discussion shows, this issue has been resolved by *Ocean County*, and the Federal Government cannot provide a meaningful distinction. As

---

[3] The Federal Government responds that the ITD may be preempted even if the Court (rightly) understands it to govern only New Jersey's allocation of its own resources, citing *Wisconsin Department of Industry, Labor and Human Relations v. Gould Inc.*, 475 U.S. 282 (1986). In that case, the Supreme Court held that the National Labor Relations Act (NLRA) preempted a Wisconsin statute debarring repeat violators of the NLRA from doing business with the state. But that case turned on the fact that debarment impermissibly "functions unambiguously as a supplemental sanction *for violations of the NLRA*," *id.* at 288 (emphasis added), not as a means of regulating the state's allocation of resources. The ITD, by contrast, does not in any way impose supplemental sanctions on individuals who violate federal immigration law.

7

laid out above, *Ocean County* refutes its overbroad view of conflict preemption, the reach of the INA's text, the reach of the ITD, and the implications of key precedents. Against all that, the Opposition Brief says only that this case can come out differently because, "unlike the plaintiffs in *County of Ocean*, the United States has plausibly alleged—and is prepared to demonstrate—[this Section] obstruct[s] federal officers' enforcement of the INA." Opp. Br. 3. Leaving aside that the United States supported those plaintiffs, *see* No. 19-18083, ECF 25 ("SOI") at 9-13, the Federal Government misunderstands *Ocean County*. The issue was not the *degree* to which the ITD makes immigration agents' jobs harder, or how specific those allegations were, but rather whether the ITD is the *kind* of law that conflicts with the INA. *See Ocean County*, 2020 WL 4345317, \*17 (holding that "expend[ing] extra efforts and resources to apprehend aliens who are subject to removal, does not create the kind of 'direct' obstacle necessary to trigger conflict preemption"); *see also California II*, 921 F.3d at 889 (same). This Court's conclusions thus dispose of this Complaint too, no matter that the allegations of enforcement costs are pled in more detail.

      ii.    *The Canon Of Constitutional Avoidance Confirms That The INA Does Not Preempt This Section.*

The conclusion that obstacle preemption cannot apply finds further support in the anticommandeering doctrine. The question before this Court is whether the INA precludes New Jersey from setting the terms for whether and when its own state and local law enforcement officers participate in federal civil immigration enforcement

8

activities. *See Ocean County*, 2020 WL 4345317, *17 (agreeing that Section II.B.5 simply "defin[es] the contours of New Jersey's and its localities' involvement in the enforcement of federal civil immigration law"). It is black letter anticommandeering law that the Federal Government cannot *require* state and local officers to participate in civil immigration enforcement. *See* MTD Br. 22-23 (quoting *Printz v. United States*, 521 U.S. 898, 925 (1997); *New York v. United States*, 505 U.S. 144, 166 (1992)). And it is equally clear after *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that the Tenth Amendment also prevents the United States from issuing orders directing states not to control their own officers' participation in such programs. It follows that "[e]xtending conflict or obstacle preemption to [the ITD] would, in effect, dictate what a state legislature may and may not do" in violation of the Tenth Amendment, since "it would imply that a state's otherwise lawful decision *not* to assist federal authorities is made unlawful when it is codified as state law." *California II*, 921 F.3d at 890 (citation omitted); *see Ocean County*, 2020 WL 4345317, *15 (agreeing that "the United States' position that such obstruction [by the ITD] is unlawful runs directly afoul of the Tenth Amendment and the anticommandeering rule").

None of the Federal Government's arguments that this Court should "reject[]" *California II* and its application of anticommandeering principles are persuasive. It argues that New Jersey "acknowledge[s] that Sections 1226 and 1231 of the INA do

9

not issue any direct order to state and local officials," and says that, as a result, the Federal Government's preemption theory "does not require interpreting the INA as issuing a direct order to state or local officials." Opp. Br. 31. New Jersey, of course, *agrees* that Sections 1226 and 1231 do not govern state conduct at all—which is why preemption does not apply. *See* Part I.A, *supra*; *Ocean County*, 2020 WL 4345317, *15. But if the United States' preemption theory were to prevail instead, this Court would necessarily be holding that the *assumptions* undergirding Sections 1226 and 1231 suffice to order the States to allow officers to participate in federal operations. That, of course, is just as pernicious as an order contained in the text, if not more so. It would make no sense for the Tenth Amendment to guard against direct commands to the States, but to leave states vulnerable to equally binding implied orders drawn only from federal assumptions. It is not the form of the command that matters, but its content: regulation of States is allowed only where it reflects the "evenhanded[] regulat[ion]" of "an activity in which both States and private actors engage," no matter whether the Federal Government is framing that command under express or implied preemption principles. *Murphy*, 138 S. Ct. at 1478.

Contrary to the Federal Government's claims, Sections 1226(a), 1226(c), and 1231(a) in no way "regulate[] private parties by establishing rules that govern their detention and release." Opp. Br. 33. The Supreme Court has urged that courts "look beyond [Congress's] phrasing" when conducting this inquiry and instead focus on

10

who is actually regulated by the statute at issue. *Murphy*, 138 S. Ct. at 1480-81. And under the Federal Government's interpretation, these sections would divest States of their power to set statewide rules for whether officers share release-date information and participate in civil immigration operations. But that regulates only how the State can legislatively direct its officers and how its officers enforce the law, and it would obviously not in any way regulate private conduct. While it is true (as the Federal Government emphasizes) that private parties will be *affected* by this decision, that is not the proper analysis, as any law governing officers has some downstream impacts on private parties. Indeed, under such an approach, *Printz* and *Murphy* would have been wrongly decided; while the laws at issue there were invalid since they directly regulated state legislatures and state law enforcement, those laws of course still had an impact on private parties, including gun purchasers and gamblers. That is why this Court recognized the case law demands a look at "what actors a statute seeks to *regulate*." *Ocean County*, 2020 WL 4345317, *10 (emphasis added). As interpreted by the Federal Government, the key sections of the INA impermissibly regulate state officials—not private parties. That exceeds what the Tenth Amendment permits.

B.   Section II.B.5 Of The Immigrant Trust Directive Does Not Violate Principles Of Intergovernmental Immunity.

Again relying on reasoning this Court has rejected, the Federal Government makes no more headway challenging Section II.B.5 on intergovernmental immunity grounds. As previously explained, under this doctrine, a "state regulation is invalid

11

only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *Ocean County*, 2020 WL 4345317, *20 (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990)). As this Court held, in reliance on *United States v. California* (*California I*), 314 F. Supp. 3d 1077, 1111 (E.D. Cal. 2018), "because the Directive neither regulates the United States nor discriminates against it, the Directive is not invalid under the principles of intergovernmental immunity." *Ocean County*, 2020 WL 4345317, *20.[4]

While the Opposition Brief offers a more thorough exposition of the Federal Government's theory as to why the ITD violates the doctrine of intergovernmental immunity, its basic argument remains unchanged. Whereas before it had "generally allege[d]" that the ITD discriminated against it, *id.* at *20, the United States is now arguing that the ITD "singles out the Federal Government for disfavored treatment" by placing limits on communications from state and local law enforcement officers to federal *civil immigration* authorities, but not on communications from the same state and local officers to *criminal* law enforcement agencies. Opp. Br. 3-4. The

---

[4] The Federal Government seeks to cast doubt on the validity of this Court's holding, arguing that "neither plaintiff raised [intergovernmental immunity claims] in *County of Ocean*," and that this Court only "briefly discuss[ed] the issue based on minimal briefing." Opp. Br. 3. But the United States is the one that pressed this argument in *Ocean County*, *see* SOI 2, 16-17, and while this Court did raise questions about the procedural propriety of addressing claims raised only in a Statement of Interest, it nevertheless proceeded to resolve them. *See Ocean County*, 2020 WL 4345317, *19 (recognizing this argument may have "procedural defect," but deciding "for the sake of completeness [to] address it" and rejecting the Federal Government's theory).

premise is that so long as *any* other public entity receives the information covered by the ITD, New Jersey has violated the Constitution. *Id.* at 23.

There are three independent problems with this argument, any or all of which suffice to dismiss the claim. For one, it is not enough that the law treats the Federal Government different than some other entity; the law must distinguish between the Federal Government and "similarly situated" entities. *California I*, 314 F. Supp. 3d at 1088 (quoting *North Dakota*, 495 U.S. at 435); *see also id.* (adding "regulation is not invalid simply because it distinguishes between the two sovereigns"); *cf. Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 543 (1993) (noting that the "similarly situated" comparator will be one "that endangers the [State]'s interest in a similar or greater degree"). Here, of course, the Directive treats analogous activity alike: while information can be shared with state and local criminal law enforcement agencies, such information can also be shared with federal criminal law enforcement agencies. *See Compl.* ¶ 33 (admitting the Directive's requirements "do not apply to other federal authorities"). In other words, the most analogous comparators between federal agencies and state and local agencies are treated identically, which confirms that New Jersey is not seeking to discriminate. Rather, all the Directive does is draw a line between *civil immigration* operations and *criminal* law enforcement. Because that treats two dissimilar activities differently, it is not unlawful. *See, e.g., California I*, 314 F. Supp. 3d at 1111 (rejecting same claim because "Plaintiff has not identified

13

any examples of similarly situated authorities (i.e., civil law enforcement agencies) that the State treats better than it does federal immigration authorities.").[5]

For another, even *if* there is a distinction between similarly situated entities—and again, there is not—that distinction is still permissible where "'the inconsistent treatment is directly related to, and justified by, significant differences between the two classes.'" *Id.* at 1089 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 816 (1989)). That is certainly true in this case. As the Attorney General found, there are significant concerns when state and local law enforcement participate in the civil immigration enforcement apparatus, including when they provide information that facilitates removal. *See, e.g.*, Directive 2018-6 at 1 (finding immigrants "less likely to report a crime" or cooperate with law enforcement when officers are working with civil immigration agents); *Ocean County*, 2020 WL 4345317, *3 (noting "studies … confirm that immigration-related fears prevent individuals from reporting crimes"). The Federal Government may disagree as a policy matter, but it is clearly what the ITD relates to, further disproving the idea that this is rank discrimination.

---

[5] The Federal Government's response is passing strange. In its view, so long as it is the only entity engaging in a certain activity, differential treatment of that activity is *necessarily* unconstitutional. *See* Opp. Br. 23 ("discrimination against immigration officers is necessarily discrimination against the Federal Government"). That would make short shrift of the requirement that discrimination has to be against "similarly situated" entities. And it would prevent a State from ever declining to participate in a program run only by a federal agency—from immigration to patent enforcement. The United States cannot identify a single case that stands for such a result.

Finally, the Federal Government's reading of the intergovernmental immunity rules would turn anticommandeering law on its head. As the Ninth Circuit explained, any "finding that [the Directive] violates the doctrine of intergovernmental immunity would imply that [States] *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment." *California II*, 921 F.3d at 891; *see also Ocean County* at *20 (same). The Federal Government offers no basis to distinguish *California II* and *Ocean County*. Instead, it maintains tautologically that the Tenth Amendment bars states from discriminating, essentially arguing that *California II* is wrong and that anticommandeering protections for States must simply give way. But no court has so held and the consequences of that view are untenable. By that logic, New Jersey would have to participate in a federal immigration raid simply because it had also agreed to participate in a multistate criminal task force to root out online child predators—a result inconsistent with the principles of the Tenth Amendment that protect the State's autonomy and enforcement discretion. And while the United States seeks to justify that result by reiterating that anticommandeering speaks only to literal (rather than implicit) orders, that response fails as laid out above.

## II. SECTION VI.A OF THE IMMIGRANT TRUST DIRECTIVE DOES NOT VIOLATE THE SUPREMACY CLAUSE.

Though Section VI.A was not litigated in *Ocean County*, the challenge to this provision fails for many of the same reasons. As explained in the State's Opening

Brief, Section VI.A requires law enforcement officers to notify detained individuals when federal civil immigration authorities request 1) to interview the detainee; 2) to be notified of the detainee's release; and 3) that the State continue detaining the detainee past the time he would otherwise be eligible for release. *See* MTD Br. 34. Although the Federal Government understandably does not claim that Section VI.A is expressly preempted by federal law—as there is no provision of the INA that even remotely prohibits such notification—the United States claims that Section VI.A is conflict preempted and thus must be enjoined. That argument falls short.

As with the information-sharing provisions of the ITD, Section VI.A is not conflict preempted by the INA because it does not "impose a true 'obstacle' on the federal government's execution of civil immigration law." *Ocean County*, 2020 WL 4345317, *17. Perhaps most notably, the Federal Government does not identify a conflict between Section VI.A and any specific provision of the INA. Instead, just as explained above, the Federal Government's "arguments ignore that sections 1226 and 1231(a)(1) impose obligations solely on the federal government," and overlooks that the INA says *nothing* about the information that States may or may not provide to their detainees. *Id.*[6] Said differently, if an officer—or a law enforcement agency—

---

[6] To the degree the Federal Government has said anything on the subject, it has been to authorize sharing of these detainers. The Federal Government responds that Form I-247A only says the "alien must be served with a copy of this form for the detainer to take effect." Opp. Br. 10 n.3. But that misses the point. No one argues that Form

16

provided copies of detainers to detainees, the Federal Government would not be able to point to any provision of law that had been violated. Nothing about that changes just because the State's Chief Law Enforcement Officer set uniform statewide rules to govern these discretionary decisions, as he has the authority to do.

Because the Federal Government cannot identify a conflict between Section VI.A and any provision of the INA, it again returns to its theme that this provision must be invalidated because it could lead to a situation in which civil immigration agents have to spend more time apprehending someone. But as laid out above, that reasoning is not enough: "Merely because a state law 'inconveniences' the federal government does not render it preempted—'the repugnance must be so direct and positive that the two acts cannot be reconciled or consistently stand together.'" *Ocean County*, 2020 WL 4345317, *17 (quoting *California I*, 314 F. Supp. 3d at 1088). Simply put, the fact that sharing the detainer with someone *may* mean "law enforcement agencies [have to] expend extra efforts and resources to apprehend aliens who are subject to removal, does not create the kind of 'direct' obstacle necessary to trigger conflict preemption." *Id.* It is hard to see how the United States can overcome the "strong presumption against preemption" based on nothing more

---

I-247A compels every disclosure officers might make, but it is more evidence that at least some notification was contemplated, and that no provision contains language actually prohibiting the kinds of notifications that Section VI.A sets forth. Were the conflict so apparent, one would expect greater clarity.

17

than general claims of enforcement costs. *Id.* at *15. Nor is it clear why the mode of analysis that failed to persuade with respect to Section II.B.5 should control here.[7]

Once again, constitutional principles have a role to play. As noted above, the Federal Government does not dispute that an individual officer could decide to share detainers with the affected detainees and does not seem to take issue with that result. Instead, its objection is that the New Jersey Attorney General set statewide rules for exercising that discretion. Said another way, it wants this Court to order a regime in which the line officer gets to make the call, and the State's Chief Law Enforcement Officer cannot tell her how to do so. That, of course, runs headlong into the Court's "assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism." *Nixon v. Mo. Mun. League*, 541 U.S. 125, 140 (2004). To empower officers over the Attorney General would impermissibly infringe on New Jersey's right to regulate its law enforcement agencies as it sees fit, based on no more than a general claim that federal immigration authorities' jobs could be more easily achieved that way. More is needed to overcome the "traditional state authority to order its government" that the Supreme Court has celebrated, *id.* at 130, especially because—once again—the

---

[7] Plaintiffs' argument that Section VI.A violates intergovernmental immunity fares no better. Again, the State is not discriminating against the Federal Government, and it continues to treat similarly situated federal agencies the same as state and local agencies. Instead, it is drawing a line between immigration operations and criminal law enforcement and has more than sufficient reasons to do so. *See* Part I.B, *supra*.

18

Federal Government's command would apply only to the States and their officers, and would not in any way regulate private parties.

Because Section VI.A withstands traditional preemption analysis, the United States focuses most of its attention on attacking the provision's underlying policy rationales. But its pronouncement that New Jersey's decision "makes little sense," Opp. Br. 20, is irrelevant to the inquiry—the established preemption test focuses on *conflicts* between the federal and state rules, and does not support a searching inquiry by federal courts into the costs and benefits of the State's policy, let alone in all its various applications. In any event, the Federal Government is wrong. Myriad aspects of Section VI.A have benefits it does not refute. For example, informing someone that federal immigration agents wish to interview her is necessary to ensure consent to that interview, a point the Opposition Brief does not dispute or address at all. And informing that individual of a detainer request any time an agency could honor it— even if it ultimately decides not to do so—helps ensure that the agency evaluates any considerations raised by the immigrant before exercising their discretion. *See* MTD Br. 35. The Federal Government again responds to none of that.

The Federal Government's objection appears to be to one narrow application of Section VI.A—requests for release-date information where, under the Directive, it cannot be provided. Leaving aside the strangeness of an argument that a particular law is preempted in its application because the Federal Government thinks the policy

19

rationale for that application is weaker,[8] the United States ignores the benefits of this rule. As detailed above, the raison d'etre of the ITD is to "strengthen the relationship between its communities and police, and shore up more effective enforcement of state criminal law." *Ocean County*, 2020 WL 4345317, *17. And as amici explain, "notifications allow individuals in state or local custody to seek legal advice, gather documents and other evidence, communicate with their families, and otherwise prepare for the fact that they may be required to undergo immigration proceedings in the future," ECF No. 15-2 at 35, all results that directly coincide with the State's interest in strengthening trust. Still more, the notification provisions also achieve the goals of uniformity and consistency, such that these results do not vary from agency to agency and from officer to officer, a critical duty for the Chief Law Enforcement Officer. In other words, although preemption does not rise or fall on these questions of policy, the Federal Government should not even prevail on its own terms.

## CONCLUSION

For these reasons, this Court should dismiss the Complaint in its entirety.

---

[8] It bears noting that even if the Court erroneously found the policy rationales to be both relevant and unsupportable, relief could only apply to this narrow context, and the remainder of the challenge to Section VI.A would still require dismissal.

20

Respectfully submitted,

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By:   /s/ Daniel M. Vannella
      Daniel M. Vannella
      Assistant Attorney General (015922007)

Dated: August 31, 2020

21