**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 20-1364 (FLW) (TJB) |
| | : | |
| v. | : | |
| | : | |
| THE STATE OF NEW JERSEY; | : | **OPINION** |
| PHILLIP D. MURPHY, in his Official | : | |
| Capacity as Governor of the State of | : | |
| New Jersey; GUBRIR S. GREWAL, in | : | |
| his Official Capacity as Attorney General | : | |
| of New Jersey, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**WOLFSON, Chief Judge**:

The United States of America has filed a Complaint against the State of New Jersey, Phillip

D. Murphy, in his Official Capacity as Governor of the State of New Jersey; and Gubrir S. Grewal,

in his Official Capacity as Attorney General of New Jersey ("Attorney General Grewal")

(collectively "Defendants"), seeking a declaration that certain provisions of Attorney General Law

Enforcement Directive No. 2018-6, otherwise known as the Immigrant Trust Directive, violate the

Supremacy Clause of the United States Constitution.[1]  Presently before the Court is Defendants'

---

[1]      In *County of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020), this Court held that certain provisions of the Immigrant Trust Directive are not preempted by federal law.  While the United States was not a party to *County of Ocean*, it filed a Statement of Interest in which it raised similar arguments to those raised in this action.  Because of the substantial similarities between this action and *County of Ocean*, I incorporate my prior opinion by reference here, and in the interest of judicial economy, quote the opinion where appropriate.

Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure

to state a claim.[2]   For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED**.

## I.   BACKGROUND

### a.   Federal Civil Immigration Law

"The Government of the United States has broad, undoubted power over the subject of

immigration and the status of aliens" pursuant to its constitutional authority to "'establish a

uniform Rule of Naturalization' and its inherent power as a sovereign to control and conduct

relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 395 (2012) (quoting U.S.

Const., Art. I, § 8, cl. 4).  Pursuant to this authority, the Immigration and Nationality Act ("INA"),

8 U.S.C. § 1101, *et seq.*, "sets out the 'terms and conditions of admission to the country and the

---

[2]      Additionally before the Court are several motions for leave to appear as *amicus curiae* that have been filed by: (1) the City of New York and 18 other local governments, (2) Current and Former Prosecutors and Law Enforcement Leaders, (3) the District of Columbia, (4) the American Civil Liberties Union of New Jersey, and (5) Administrative, Constitutional, Immigration, and Criminal Law Scholars.  An *amicus curiae* is not a party to the litigation, but rather assists the court in a particular mater of importance in a case.  The Third Circuit has advised that "permitting persons to appear . . . as friends of the court . . . may be advisable where third parties can contribute to the court's understanding" of the matter in question.  *See Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir. 1987).  "At the trial level, where issues of fact as well as law predominate, the aid of *amicus curiae* may be less appropriate than at the appellate level, where such participation has become standard procedure."  *United States v. Alkaabi*, 223 F. Supp. 2d 583, 592 n.16 (D.N.J. 2002) (quoting *Yip v. Pagano*, 606 F. Supp. 1566, 1568 (D.N.J. 1985)); *Liberty Lincoln Mercury v. Ford Mtkg. Corp.*, 149 F.R.D. 65, 82 (D.N.J. 1993).  A district court may grant *amicus curiae* status where: "(1) the *amicus* has a 'special interest' in the case; (2) the *amicus's* interest is not represented competently or at all in the case; (3) the proffered information is timely and useful; and (4) the *amicus* is not partial to a particular outcome in the case."  *Alkaabi*, 223 F. Supp. 2d at 592.  The decision to permit an *amicus curiae* in a pending action "is solely within the broad discretion of the district court."  *Id.*  Considering these criteria, I find that participation of *amicus curiae* is not warranted in this matter.  I am familiar with both the facts and legal issues raised in this action as the Court addressed substantially similar arguments in *County of Ocean*, 475 F. Supp. 3d 355.  Indeed, as set forth *infra*, there is no reason for the Court to rule differently in this matter. As such, the participation of *amici* would not be useful or helpful to the Court.  Accordingly, the pending motions for leave to appear as *amicus curiae* are denied.

subsequent treatment of aliens lawfully in the country.'" *Kansas v. Garcia*, 140 S. Ct. 791, 797 (2020). The INA further governs "which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. "Agencies in the Department of Homeland Security [("DHS")] play a major role in enforcing the country's immigration laws," including Immigration and Customs Enforcement ("ICE"). *Id.* at 397. ICE "conducts criminal investigations involving the enforcement of immigration-related statutes" and operates the Law Enforcement Support Center, which "provides immigration status information to federal, state, and local officials around the clock." *Id.* ICE is additionally responsible "for the identification, apprehension, and removal of illegal aliens from the United States." *Id.* (quotation omitted).

Notwithstanding the federal government's "broad, undoubted power over the subject of immigration and the status of aliens," the "States possess primary authority for defining and enforcing the criminal law." *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 281 (3d Cir. 2019) (quoting *Arizona*, 567 U.S. at 281). Consistent with that sovereign power, the INA contemplates states' participation in the enforcement of immigration law since "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411–12. However, § 1357(g) does not compel state and local governments to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10).[3] Rather, the statute

---

[3]   8 U.S.C. § 1357(g)(10) specifically provides that

*Nothing in this subsection shall be construed to require* an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—

    (A) to communicate with the Attorney General regarding the immigration status of an individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

speaks in voluntary terms.  States' cooperation may include "situations where States participate in a joint task force with federal officials, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. at 410.  Furthermore, ICE may request state and local law enforcement agencies to furnish "information about when an alien will be released from their custody."  *Id.* (citing § 1357(d)); *see also* 8 C.F.R. § 287.7(a) (setting forth that DHS may issue a detainer, which acts as "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible").

Specifically relevant to the instant action are 8 U.S.C. § 1373 and 8 U.S.C. § 1644, which govern the sharing of information between state and local governments and the federal government in the enforcement of immigration laws.  These sections provide that

> [n]otwithstanding any other provision of Federal, State or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [federal government] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

8 U.S.C. § 1373(a); *see also* 8 U.S.C. § 1644 ("Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.").

---

> (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully in the United States.

(emphasis added).

Correspondingly, the federal government "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the request verification or status information." *Id.* § 1373(c).

Finally, relevant to the parties' arguments, here, are sections 1226 and 1231(a). These provisions govern the arrest and detention of an alien by federal civil immigration authorities pending removal. Section 1226(a) provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." Except as provided in § 1226(c), the Attorney General is permitted to (1) "continue to detain the arrested alien"; and (2) release the alien on bond or conditional parole. 8 U.S.C. § 1226(a)(1)–(2). Section 1226(c) provides for circumstances under which the Attorney General is required to take mandatory custody of an alien subject to removal and specifically provides that:

> The Attorney General shall take into custody any alien who—
>
> (A)   is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> (B)   is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> (C)   is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of a least 1 year, or
>
> (D)   is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

§ 1226(c)(1)(A)–(D).  8 U.S.C. § 1231(a)(1)(A) provides that "[e]xcept as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')." The removal period begins to run on the latest date of the following:

> (i)     The date the order of removal becomes administratively final.
>
> (ii)    If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
>
> (iii)   If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

*Id.* § 1231(a)(1)(B).

### b.  The Immigrant Trust Directive & the Instant Case

On November 29, 2018, Attorney General Grewal issued Attorney General Law Enforcement Directive No. 2018-6 (the "Immigrant Trust Directive" or "Directive"), which was thereafter revised on September 27, 2019.  The Immigrant Trust Directive was issued to amend certain policies governing the interaction of state and local law enforcement and federal immigration authorities.  *See* State of New Jersey, Attorney General Law Enforcement Directive No. 2018-6 v2.0 ("Directive No. 2018-6").  These amendments were necessary, according to Attorney General Grewal, based on the increased reliance of the federal government on state and local law enforcement agencies to enforce federal civil immigration law, which has "present[ed] significant challenges to New Jersey's law enforcement officers who have worked hard to build trust with [the] state's large and diverse immigration communities."  *Id.*  Accordingly, the Immigrant Trust Directive places certain limitations on the ability of local, state, and county law

enforcement to assist the federal government with the enforcement of federal civil immigration law.

The United States specifically takes issue with two provisions of the Immigrant Trust Directive.  First, Section II.B of the Directive limits the ability of state, local, and county law enforcement from providing certain "types of assistance to federal immigration authorities when the sole purpose of that assistance is to enforce federal civil immigration law."  Relevant here, Section II.B.5 prohibits state, local, and county law enforcement from:

> Providing notice of a detained individual's upcoming release from custody, unless the detainee:
>
>> a) is currently charged with, has ever been convicted of, has ever been adjudicated delinquent for, or has ever been found guilty by reason of insanity of, a violent or serious offense as that term is defined in Appendix A[4];
>>
>> b) in the past five years, has been convicted of an indictable crime other than a violent or serious offense; *or*
>>
>> c) is subject to a Final Order of Removal that has been signed by a federal judge and lodged with the county jail or state prison where the detainee is being held.

Directive No. 2018-6, § II.B.5.  The Directive further sets forth certain exceptions to the limitations set forth in Section II.B, and provides that

> Nothing in Sections II.A and II.B shall be construed to restrict, prohibit, or in any way prevent a state, county, or local law enforcement agency or official from:
>
>> 1. Enforcing the criminal laws of this state.

---

[4]     The term "violent or serious offense" is defined as: (1) "[a]ny first or second degree offense, as defined in N.J.S.A. § 2C:43-1"; (2) [a]ny indictable domestic violence offense as defined in N.J.S.A. § 2C:25-19, as well as any domestic violence assault defined in N.J.S.A. § 2C:25-19A(2)"; (3) "[a]ny other indictable offense" set forth in Appendix A of the Directive; and (4) "[a]ny indictable offense under the law of another jurisdiction that is the substantial equivalent to an offense described in paragraphs 1-3."  Directive No. 2018-6, App. A.

2. Complying with all applicable federal, state, and local laws.

3. Complying with a valid judicial warrant or other court order, or responding to any request authorized by a valid judicial warrant or other court order.

4. Participating with federal authorities in a joint law enforcement taskforce the primary purpose of which is unrelated to federal civil immigration.

5. Requesting proof of identity from an individual during the course of any arrest or when legally justified during an investigative stop or detention.

6. Asking an arrested individual for information necessary to complete the required fields of the LIVESCAN database (or other law enforcement fingerprinting database), including information about the arrestee's place of birth and country of citizenship.

7. Inquiring about a person's place of birth on a correctional facility intake form and making risk-based classification assignments in such facilities.

8. Providing federal immigration authorities with information that is publicly available or readily available to the public in the method the public can obtain it.

9. When required by exigent circumstances, providing federal immigration authorities with aid or assistance, . . . .

10. Sending to, maintaining or receiving from federal immigration authorities information regarding the citizenship or immigration status, lawful or unlawful, of any individual. *See* 8 U.S.C. §§ 1373, 1644.

*Id.* § II.C (footnote omitted).

Next, the United States challenges Section VI.A of the Directive, which provides that

State, county, and local law enforcement agencies and officials shall promptly notify a detained individual, in writing and in a language the individual can understand, when federal civil immigration authorities request:

1. To interview the detainee.  (*See* § II.B.4.)

2. To be notified of the detainee's upcoming release from custody.  (*See* § II.B.5.)

3. To continue detaining the detainee past the time he or she would otherwise be eligible for release.  (*See* § II.B.6.)

When providing such notification, law enforcement officials shall provide the detainee a copy of any documents provided by immigration authorities in connection with the request.

*Id.* § VI.A.

On February 10, 2020, the United States filed the instant action, seeking a declaratory judgment to invalidate the Immigrant Trust Directive as preempted by federal law under the Supremacy Clause of the United States Constitution and an injunction barring Defendants from enforcing the Directive.  This motion to dismiss followed.

## II.   <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief may be granted."  Fed. R. Civ. P 12(b)(6).  When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. Cty. Of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted).  Under this standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

9

## III.   **DISCUSSION**

### A.  **The Supremacy Clause and Preemption**

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution of laws of any State to the contrary notwithstanding."  U.S. Const., Art VI, cl. 2. The Supreme Court has explained that the Supremacy Clause sets forth a "'rule of decision' . . . that federal law is supreme in case of a conflict with state law." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1479 (2018) (citation omitted) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015)).  Put differently, "[s]tate law that conflicts with federal law is . . . 'without effect.'" *Atkinson v. Luitpold Pharms., Inc.*, 448 F. Supp. 3d 441, 446 (E.D. Pa. 2020) (quoting *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472, 475 (2013)).  There are three categories of preemption: express preemption, conflict preemption, and field preemption.  *Murphy*, 138 S. Ct. at 1480.  Here, the United States argues that Sections II.B.5 is expressly preempted by the INA and that both Sections II.B.5 and VI.A of the Directive are conflict-preempted by the INA.

### i.   **Conflict Preemption**

The United States first contends that Sections II.B.5 and VI.A are both conflict-preempted by the INA.  Conflict preemption occurs where a state law conflicts with federal law, notably in "cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399400 (citations omitted) (first quoting *Florida Line & Avocado Growers, Inc. v. Paul*, 372 U.S. 132, 142–43 (1963); and then *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Farnia v. Nokia, Inc.*, 625 F.3d 97, 122 (3d Cir. 2010) ("Conflict preemption exists (1) 'where it is impossible for a private

party to comply with both state and federal requirements' or (2) 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (quoting *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 251 (3d Cir. 2008))).   There is, however, "a strong presumption against preemption when Congress legislates in an area traditionally occupied by the States."  *United States v. California (California I)*, 314 F. Supp. 3d 1077, 1088 (E.D. Cal. 2018).  In that connection, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"  *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator, Co.*, 331 U.S. 218, 230 (1947)).

### a.  Section II.B.5

The United States contends that Section II.B.5 of the Directive, which sets forth when state, county, and local law enforcement officials are free to share information regarding an individual's immigration status with the federal government, conflicts with the "clear congressional" commands that (1) "aliens generally must serve their state criminal sentences before removal," *see* 8 U.S.C. § 1231(a)(4)(A), and (2), that "federal immigration officers are to assume custody of unlawfully present aliens immediately upon their release from state or local custody," *see* 8 U.S.C. §§ 1226(a), (c), 1231(a).  (Opp. Br., at 13.)

I addressed this exact argument in *County of Ocean.*  There, the plaintiffs and the United States, as an interested party, maintained that sections 1226 and 1231 preempted the information sharing provisions of the Directive.  This position was rejected because "sections 1226 and 1231(a)(1) impose obligations solely on the federal government."  *County of Ocean*, 475 F. Supp. 3d at 380.  In that connection, I explained:

> [U]nder those statutes, state and local law enforcement agencies
> have no duty to assist the federal government with carrying out those

11

obligations, except as required by sections 1373 and 1644, *i.e.*, information sharing. Indeed, nothing in sections 1231(a)(1) and 1226 suggests "that Congress impliedly mandated that state and local governments would act in accordance with these statutes." As the Ninth Circuit has observed, "[e]ven if Congress had every expectation that [the States] would [comply with these sections], and opted not to codify its belief based on the presumption that states would conduct their law enforcement activities in concert with federal immigration efforts, it is a state's historic police power—not preemption—that we must assume, unless clearly superseded by federal statute." *United States v. California (California II)*, 921 F.3d 865, 887 (9th Cir. 2019). Simply put, "[f]ederal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating whether their localities cooperate in immigration enforcement." *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018)

*County of Ocean*, 475 F. Supp. 3d at 380–81 (alterations in original). I further noted that other courts that have considered the validity of State restrictions on the sharing of information with federal immigration authorities have held that such restrictions do not involve "affirmative *interference* with federal law enforcement," but, rather reflect a "choice as to how to devote law enforcement resources." *Id.* at 381 (quoting *City of Chicago v. Sessions*, 888 F.3d 272, 777 (7th Cir.), *vacated in part*, 2018 WL 426817 (2018) (en banc)); *see also California I*, 314 F. Supp. 3d at 1105. Accordingly, I determined that, in implementing the Directive, "New Jersey has made the decision not to cooperate with the enforcement of federal immigration law in an effort to strengthen the relationship between its communities and police, and shore up more effective enforcement of state criminal law." *County of Ocean*, 475 F. Supp. 3d at 381. Thus, because Section II.B.5 did not impose a true "obstacle" on the federal government's execution of federal civil immigration law, it is not conflict-preempted by the INA.

Nevertheless, the United States again urges that Section II.B.5 "stands as an obstacle to federal immigration officers' ability to assume custody of unlawfully present aliens in the manner Congress intended." (Opp. Br., at 14.) Indeed, the United States contends that, unlike the plaintiffs

in *County of Ocean*, they have plausibly alleged that the Directive's restriction on the sharing of information with federal immigration officials imposes a true obstacle on the federal government's execution of civil immigration law.  (*Id.* at 16.)  I remain unconvinced.  The United States suggests that, by declining to provide federal civil immigration authorities with release dates for removable aliens, New Jersey "hinders federal officials from discharging their duties under the INA."  (*Id.*)  However, as I explained in *County of Ocean*, New Jersey's decision not to cooperate with the enforcement of federal immigration law is a clear exercise of its police power to regulate the conduct of its own law enforcement agencies.  *See California I*, 314 F. Supp. 3d at 1105.

The Seventh Circuit's observation on this issue is salient.  In *City of Chicago v. Sessions*, the United States argued that Chicago's Welcoming City Ordinance, which limits the type of information shared with federal immigration authorities, permitted localities to thwart federal law enforcement.  888 F.3d at 277.  The Seventh Circuit explained that the Welcoming City Ordinance did not present "any affirmative *interference* with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities."  *Id.* at 282.  Rather, "[t]he only conduct at issue . . . is the refusal of the local law enforcement to aid in civil immigration through informing the federal authorities when persons are in their custody."  *Id.*  That decision is one that must be left to state and local authorities.  *Id.*; *see also California I*, 314 F. Sup. 3d at 1105.  As I observed in *County of Ocean*,

> While it may very well be easier for federal law enforcement to effect removals if it has states' assistance, that does not change the clear command of sections 1226 and 1231(a)(1), which place the burden of complying with the INA on the federal government, not state and local authorities.  Merely because a state law "inconveniences" the federal government does not render it preempted—"the repugnance must be 'so direct and positive that the two acts cannot be reconciled or consistently stand together.'" *California I*, 314 F. Supp. 3d at 1088 (quoting *Goldstein v. California*, 412 U.S. 546, 554–55 (1973)).  Rather, the fact that the

13

> federal government may, without the cooperation of local law enforcement agencies, expend extra efforts and resources to apprehend aliens who are subject to removal, does not create the kind of "direct" obstacle necessary to trigger conflict preemption. *See id.* at 1104 (finding that California's limitations on sharing information with the federal government was not an obstacle to the federal government's enforcement of civil immigration law).

*County of Ocean*, 475 F. Supp. 3d at 382.

Finally, the United States asserts that the Supreme Court's decision in *Arizona* reenforces its position that sections 1226 and 1231(a) preempt the Directive. *Arizona*, however, has limited applicability here. In *Arizona*, the United States challenged an Arizona state law which, among other things, made it a state misdemeanor offense for failing to comply with federal alien-registration requirements or to seek or engage in work in the State as an unauthorized alien, and permitted state and local law enforcement officers "to arrest without a warrant a person 'the officer has probable cause to believe . . . has committed any public offense that makes the person removable from the United States." 567 U.S. at 394 (alteration in original). The Supreme Court held that these provisions of the Arizona law were preempted by the INA because they frustrated the objectives of Congress. Indeed, in finding that the provision that permitted the warrantless of arrest of aliens, the Court explained that

> Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific limited circumstances. By nonetheless authorizing state and local officers to engage in these enforcement activities as a general matter, § 6 creates an obstacle to the full purposes and objectives of congress.

*Id.* at 410. Unlike in *Arizona*, Section II.B.5 does not obstruct the federal government's objectives, because the INA, itself, contemplates that state and local governments have "the *option*, not the *requirement*, of assisting federal immigration authorities." *See California II*, 921 F.3d at 889; *see also* 8 U.S.C. § 1373(a). Simply because New Jersey's choice in this regard may make it more

difficult for federal law enforcement to detain removable aliens does not, in and of itself, frustrate the objectives of the INA.  Indeed, the Immigrant Trust Directive does not compel state or local law enforcement officers to interfere with any commands of federal law.  More importantly, the INA simply does not contemplate that States are obligated to assist in the federal government's enforcement of civil immigration law.

For these reasons, I find that Section II.B.5 of the Directive is not conflict preempted by the INA.[5]

### b.  Section VI.A

The United States next argues that Section VI.A of the Directive, which requires that "state, county, and local law enforcement agencies and officials" notify a detained individual when "federal civil immigration authorities request (1) "[t]o interview the detainee," (2) "[t]o be notified of the detainee's upcoming release from custody," and (3) "[t]o continue detaining the detainee past the time he or she would otherwise be eligible for release,"[6] Directive No. 2018-6 § VI.5, is conflict-preempted by the INA.  The United States further argues that this section of the Directive directly interferes with the enforcement, and frustrates the full effectiveness, of federal civil immigration law as it "serve[s] to alert aliens that 'federal civil immigration authorities' may be interested in detaining them."  (Opp. Br., at 19.)

---

[5]     The Court declines to address the parties' arguments with respect to sections 1226 and 1231 and the anticommandeering doctrine because "those sections do not apply to state actors and place obligations solely on the federal government."  *County of Ocean*, 475 F. Supp. 3d at 380 n.22.  The anticommandeering doctrine, which emerges from the Tenth Amendment, provides that "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."  *Printz v. United States*, 521 U.S. 898, 925 (1997); *see also Murphy*, 138 S. Ct. at 1475–76.  Because sections 1226 and 1231 do not place any obligations on state officials, the anticommandeering doctrine plays no rule in the Court's preemption analysis.

[6]     Whether Section VI.A of the Directive violates the Supremacy Clause was not raised in *County of Ocean*.

In defense of Section VI.A, Defendants contend that the notification provisions cannot be preempted because they "exclusively govern[] the relationship and communications between a local law enforcement agency and its detainees." (Moving Br., at 36.)  In that regard, Defendants maintain that the INA cannot bar an "individual officer from telling any detainee that civil immigration authorities seek to interview her, find out her release date, or have her detained past the time she is eligible for release." (*Id.*)  It follows, they argue, that a State policy requiring the same notifications similarly does not conflict with the INA. (*Id.*)

The Supreme Court has explained that "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'"; [as] such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 11 (1992) (Kennedy, J., concurring in part and concurring in judgment)).  In that regard, "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Id.* (quoting *Gade*, 505 U.S. at 110).

Here, the United States has not made such a showing.  In essence, the Government's argument is that Section VI.A "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" because it "tips off" "a soon-to-be released alien that federal officers will seek to detain him or her." (Opp., at 21 (quoting *Arizona*, 567 U.S. at 399.) In that connection, the United States posits that Section VI.A should be preempted because it will hinder federal officers in their efforts to detain aliens and, moreover, "permit[s] Defendants to help aliens evade federal immigration enforcement." (*Id.*)  The United States, however, fails to provide any support for this speculative position that by providing an alien with adequate notice that federal

immigration authorities have requested information, seek to interview, or detain him, will somehow assist aliens with avoiding removal. Such a vague and unsupported assertion cannot serve as a basis to preempt a state law. As the Court made plain in *County of Ocean*, merely because providing notice to detainees may theoretically lead to "law enforcement agencies [having to] expend extra efforts and resources to apprehend aliens who are subject to removal, does not create the kind of 'direct obstacle' necessary to trigger conflict preemption." 475 F. Supp. 3d at 382.

For example, in *California I*, the Eastern District of California found that a state law that required employers to notify their employees "of any inspections of I-9 Employment Eligibility Verification forms or other employment records conducted by an immigration agency within 72 hours of receiving notice of the inspection" was not preempted by the Immigration Reform and Control Act of 1986 ("IRCA"). 314 F. Supp. 3d at 1096–97 (quotation omitted). The United States argued that this notice provision was "an obstacle to the implementation of federal law by aiming to thwart immigration regulation" as it would alert targets of investigation as to the status of the United States' enforcement efforts. *Id.* at 1097. The *California I* court declined to adopt the United States' "cynical view of the law" and found that simply notifying employees of an inspection was not an attempt to thwart the goals of the IRCA. *Id.*

Similarly here, Section VI.A of the Directive was not intended to obstruct the United States' efforts to enforce immigration law. Rather, as consistent with the overall purposes of the Directive, Section VI.A is aimed at building trust between New Jersey's immigrant communities and state and local law enforcement. Indeed, each notification requirement is linked to other provisions of the Directive. For example, the requirement that law enforcement notify a detainee of an interview request from the federal government is necessary to obtain the individual's consent

to be interviewed.  *See* Directive No. 2018-6 § II.B.4 (providing that New Jersey law enforcement officers may only provide immigration authorities "access to a detained individual for an interview: when that individual has consented").[7]  Simply put, Section VI.A of the Directive does not expressly thwart the enforcement of federal civil immigration law.  As such, the Court cannot find that Section VI.A is conflict-preempted by the objectives of the INA.

### ii.  Express Preemption

Next, the United States contends that Section II.B.5 of the Immigrant Trust Directive is expressly preempted by 8 U.S.C. § 1373(a), which provides that a "[s]tate . . . or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  More specifically, in that context, the United States argues that the phrase "information regarding [an individual's] citizenship status" should be broadly construed to include providing "notice of a detained individual's upcoming release from custody."  (*See* Opp. Br., at 26.)  While the United States recognizes that this Court rejected that exact contention in *County of Ocean*, it urges the Court reconsider that ruling.

In *County of Ocean*, I determined that section 1373(a) did not expressly preempt the Directive for two reasons.  First, based on the Supreme Court's holding in *Murphy*, 138 S. Ct. 1461, I determined that section 1373(a) did not constitute a valid preemption provision:

> It is well-established that express preemption "arises when there is an explicit statutory command that state law be displaced."  *St. Thomas—St. John Hotel & Tourism Ass'n, Inc. v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232, 238 (3d Cir. 2000) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)).  Indeed, in *Murphy*, the Supreme Court clarified that all three types of preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law

---

[7]     The United States has not challenged the validity of § II.B.4 of the Directive.

confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." 138 S. Ct. at 1480.  In *Murphy*, the Court determined that the Professional and Amateur Sports Protection Act ("PASPA"), which barred states from adopting legal sports gambling schemes, did not constitute a preemption provision because there was "no way in which this provision can be understood as a regulation of private actors."  *Id.* at 1481.  Sections 1373(a) and 1644 are similar to PAPSA, in that, these sections regulate only state and local governments and do not, in any way, regulate private actors.  Indeed, in the wake of *Murphy*, several district courts have found that §§ 1373(a) and 1644 are not preemption provisions because "[b]y their plain terms, the provisions affect state and local government entities and officials; they do not regulate private actors as *Murphy* requires for preemption."  *Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 3d 1034, 1059, (D. Colo. Apr. 23, 2020); *see also Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019) (observing that "by their terms, Sections 1373 and 1644 affect only state and local government 'entit[ies]' and 'official[s]'"); *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 950 (N.D. Cal. 2018) ("Section 1373 ... does not regulate private actors or provide private actors with any additional rights in the INA's statutory scheme. DOJ's preemption argument fails on this distinction.").

*County of Ocean*, 475 F. Supp. 3d at 372.  Thus, because section 1373(a) governs only the sharing of information between the federal government and state and local officials, and does not regulate private actors in any way, I held that the provision could not act as preemption provision.  *Id.*  This alone, I noted, was a "death knell" to the position that section 1373(a) expressly preempts Section II.B.5 of the Directive.

Nevertheless, because of the significant constitutional interests raised in *County of Ocean*, I further considered whether the Directive's information sharing provisions conflict with sections 1373(a) and 1644.  *Id.* at 372–73.  In this regard, I observed that "[t]he key to determining whether the information sharing provisions of the Directive as expressly preempted by sections 1373(a) and 1644 is understanding the scope of the phrase 'information regarding the citizenship or immigration status' of any individual."  *Id.* at 373 (quoting § 1373(a)).  Accordingly, I looked to

the plain-meaning of sections 1373(a) and 1644, which "reflects that the only information that state and local governments are required to share is the legal status—*i.e.*, citizenship or immigration status—of an individual." *Id.* at 375. In reaching this conclusion, I was persuaded by the decisions of other courts that have also considered the breadth of sections 1373(a) and 1644. I noted,

> Recently, and relevant here, a number of courts have considered the language of sections 1373(a) and 1644, and their scope relating to the type of information to be shared by state and local agencies. In *California II*, the Ninth Circuit considered the validity of the California Values Act, which "limits law enforcement's 'discretion to cooperate with immigration authorities.'" 921 F.3d at 876. Substantially similar to the Directive, the California Values Act, *inter alia*, prohibits state and local law enforcement agencies from sharing with federal immigration authorities personal identifying information, such as "the individual's home address or work address," or "information regarding a person's release date." *Id.* (quoting Cal. Gov't Code § 7285.6(a)(1)). There, the United States, likewise, argued that section 1373 directly conflicts with the restrictions of the information set forth in the California Values Act, and insisted that Congress's inclusion of the term "regarding" in section 1373 indicated that the statute should be broadly construed to preempt the California law. *Id.* at 892–93. The Ninth Circuit acknowledged that, generally speaking, phrases like "regarding" have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Id.* at 891–92 (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759–60 (2018)). However, it observed that "if the term 'regarding' were 'taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for [r]eally, universally, relations stop nowhere.'" *Id.* (alteration in original) (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)). Rejecting the United States' strained reading of § 1373, the *California II* court held that the phrase "is naturally understood as a reference to a person's legal classification under federal law." *Id.* at 891. While the Ninth Circuit did not reach the issue of whether section 1373 violates the anticommandeering doctrine of the Tenth Amendment, *id.* at 893 n.19, the district court found its constitutionality "highly suspect" because it "dictate[s] what states may and may not do." *California I*, 314 F. Supp. 3d at 1101. . . .

Courts have also considered the scope of section 1373 in the context of the Edward Byrne Memorial Justice Assistance Grant ("Byrne Grant") Program, through which the federal government provides financial assistance to states and localities for criminal justice purposes. *See City & Cty. of San Francisco*, 349 F. Supp. 3d at 967; *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 295 (E.D. Pa. 2018), *aff'd in part and vacated in part on other grounds*, 916 F.3d 276 (3d Cir. 2019).   As conditions of receiving a Byrne Grant, a locality must provide ICE with advance notice of release dates of inmates and certify its compliance with section 1373.   *City of Philadelphia*, 309 F. Supp. 3d at 295.   A number of states and municipalities across the country have challenged these conditions on the grounds that they violate the Tenth Amendment.   For example, in *City of Philadelphia*, the United States argued that section 1373 requires localities to "provide advance notice of release from City custody" based on a broad interpretation of the phrase "information regarding . . . citizenship or immigration status." *Id.* at 331.   The court rejected this position, finding that the United States' reading of the statute was "simply impossible to square with the statutory text." *Id.*   Indeed, the court held that the plain meaning of the phrase "citizenship or immigration status," means "an individual's category of presence in the United States—*e.g.*, undocumented, refugee, lawful permanent resident, U.S. citizen— and whether or not an individual is a U.S. citizen, and if not, of what country." *Id.*

In reaching this conclusion, the City of Philadelphia court relied on the Northern District of California's decision in *Steinle v. City & Cty. of San Francisco*, 230 F. Supp. 3d 994 (N.D. Cal. 2017).   *Steinle* involved a suit brought pursuant to 42 U.S.C. § 1983 by the surviving relatives of a woman who was killed by an undocumented man after he had been released from the custody of the San Francisco's Sheriff's Department. *Id.* at 1004.   Prior to his release, ICE had sent a detainer request to the Sheriff's Department seeking advance notice of his release date so ICE could take custody of him. *Id.*   The Sheriff's Department did not respond to the detainer because of city policy. *Id.*   Plaintiffs alleged that the City was per se negligent, partly because it failed to comply with § 1373, which provision, plaintiffs asserted, required the city to provide advance notice of an inmate's release to ICE. *Id.* at 1005.   The *Steinle* court dismissed this claim, as it found that "[n]othing in 8 U.S.C. § 1373(a) addresses information concerning an inmate's release date." Id. at 1015.   The same conclusion was reached by the court in *City & Cty. of San Francisco*, 349 F. Supp. 3d at 967–98 ("I agree with the other district courts that found Section 1373 would support only

21

> a narrow interpretation that extends to 'information strictly pertaining to immigration status (*i.e.*, what one's immigration status is).'").

*County of Ocean*, 475 F. Supp. 3d at 374–76 (footnotes omitted).

Here, the United States has not proffered any other reasons why this Court should come to a different conclusion.  First, the United States contends that the Court's narrow interpretation of section 1373(a) "gives short shrift to recent Supreme Court precedent instructing that 'regarding' is a word of breadth."  (Opp. Br., at 28 (citing *Lamar*, 138 S. Ct. at 1759–60).)  I addressed this position in *County of Ocean*.  While I acknowledge that the term "regarding" often has a broadening effect, this Court remains unconvinced that Congress intended it to have such an effect here.  Indeed, if the phrase "information regarding immigration status" were given the broad meaning advocated for by the United States, there would be no information that would not be encompassed by the statute and "the United States would impermissibly expand the scope of these statutes to sweep in *any* information, including personal identifying data, concerning an alien in the United States."  *County of Ocean*, 475 F. Supp. 3d at 375.  "Rather, plainly, the phrase 'regarding the citizenship or immigration lawful or unlawful of any individual' means just that— information relating to the immigration status of an alien, including his/her citizenship."  *Id.* at 376.[8]

---

[8]     Again, in a repeat of *Ocean County*, the United States argues that the broadening effect of "regarding" is evident when section 1373(a) is contrasted with 1373(c).  Section 1373(c) imposes an obligation on the federal government to respond to any inquiry from state or local government agencies seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law.  The United States again argues that that "Congress' inclusion of 'regarding' in Section 1373(a), juxtaposed with its omission of such a term in an otherwise-parallel provision of the same statute, indicates that 'Congress intended a difference in meaning."  (Opp. Br., at 27 (quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014).)  Again, as set forth above, a plain reading of section 1373(a) demonstrates that the section contemplates only the sharing of information reflecting an individual's legal status in the United States.  Moreover, as I highlighted in *County of Ocean*, "the

The United States further posits the legislative history of section 1373 supports their position. As I found in *County of Ocean*, because "the plain language of sections 1373 and 1644 is clear, there is no basis to go behind the language and delve into the legislative history." 475 F. Supp. 3d at 376 n.19; *see also Whiting*, 563 U.S. at 599 ("Congress's 'authoritative statement is the statutory text, not the legislative history.'" (quoting *Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)); *Steinle*, 230 F. Supp. 3d at 1104 (declining to consider legislative history of section 1373 because of the clarity of the statutory text). This remains true. The United States has offered the Court no reason to look behind the plain language of sections 1373 and 1644.[9]

For these reasons, I once again conclude that Section II.B.5 of the Immigrant Trust Directive is not expressly preempted by the INA.

### B. <u>Intergovernmental Immunity</u>

Finally, the United States contends that both Sections II.B.5 and VI.A "violate the Supremacy Clause by obstructing federal immigration operations and discriminating against federal immigration authorities." (Compl. ¶ 41.) In other words, the United States maintains that

---

fact that subpart (c) only concerns itself with immigration status suggests, given § 1373's focus on reciprocal communication between states and the federal government, that immigration status is the extent of subpart (a)'s reach as well." 475 F. Supp. 3d at 373 n.15 (quoting *California II*, 921 F.3d at 892).

[9]     Further, if the Court were to adopt the United States' reading of section 1373, it would likely run afoul of the Tenth Amendment's anti-commandeering doctrine. As I determined in *County of Ocean*, if "sections 1373(a) and 1644 were broadly construed to cover all types of information possibly related to the enforcement of immigration law," they "would 'unequivocally dictate[] what a state legislature may and may no do.'" 475 F. Supp. 3d at 378–79 (quoting *Murphy*, 138 S. Ct. at 1478). Nevertheless, the United States once again argues that there exists an "information-sharing" exception to the anticommandeering doctrine. (Opp. Br., at 34–37.) This Court, however, has declined to find that such an exception exists. *See County of Ocean*, 475 F. Supp. 3d at 378 n.21.

these provisions violate the doctrine of intergovernmental immunity.

The principles of intergovernmental immunity were first set forth by the Supreme Court in *McCulloch v. Maryland*, in which it held that "the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the national government." *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 40910 (3d Cir. 2012) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 322 (1819)). In other words, a state law or regulation is invalid pursuant to the doctrine of intergovernmental immunity "only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990).

In *County of Ocean*, the Court briefly addressed the issue of intergovernmental immunity.[10] There, I found that the doctrine of intergovernmental immunity did not invalidate the information sharing provisions of the Directive because "there is no question that the Directive does not regulate the United States directly; it regulates only the conduct of state and local law enforcement agencies in the State of New Jersey." *County of Ocean*, 475 F. Supp. 3d at 385. Moreover, I found that the United States had "failed to demonstrate how the Directive 'discriminates' against it" or to allege any similarly situated law enforcement agency with which New Jersey permits its law enforcement to share inmate release dates. *Id.*

Here, the arguments of the United States face the same shortcomings. First, the United States has failed to demonstrate that Sections II.B.5 and VI.A of the Directive regulate or

---

[10]    In *County of Ocean*, the issue of intergovernmental immunity was raised only by the United States in its Statement of Interest. While I questioned whether the issue was properly raised, I nevertheless addressed the merits of the United States' arguments. *See County of Ocean*, 475 F. Supp. 3d at 384–85.

discriminate against the federal government.  Indeed, as the Ninth Circuit explained in *California II*, "[s]ince the advent of the doctrine, intergovernmental immunity has attached where a state's discrimination negatively affected federal activities in some way.  It is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment."  921 F.3d at 881.  Here, the Directive regulates only state and local law enforcement agencies.  Indeed, if the Court were to accept the United States' position—that because the Directive limits the ability of state and local agencies to assist with the enforcement of federal civil immigration, it discriminates against the Federal Government—state participation in such efforts would no longer be voluntary.  *See, e.g.*, *California I*, 314 F. Supp. 3d at 1111 (finding that California limitation on information sharing with the federal government did not violate doctrine of intergovernmental immunity because "the purported 'burden' is California's decision not to help the Federal government implement its immigration enforcement regime").

Nor has the United States demonstrated that the Directive treats any similarly situated parties better than the federal government.  Indeed, the United States contends that the Directive "singles out the Federal Government for disfavored treatment" by placing limits on communications from state and local law enforcement officers to federal civil immigration authorities, but not on communications to criminal law enforcement agencies.  (Opp. Br., at 3–4.)  This distinction, however, bears no weight because civil immigration operations and criminal law enforcement are not similarly situated.  Rather, the United States is required to identify examples "of similarly situated authorities (*i.e., civil law enforcement agencies*) that the State treats better than it does federal immigration authorities."  *California I*, 314 F. Supp. 3d at 1111 (emphasis added).  It has not done so.

Accordingly, the Court finds that the Directive does not run afoul of the doctrine of

intergovernmental immunity as the Directive neither regulates the United States nor discriminates against it.

**IV.**    **<u>CONCLUSION</u>**

For the reasons set forth herein, Defendants' Motion to Dismiss is **GRANTED** and the United States' Complaint is **DISMISSED.**


DATED: January 26, 2021                                  <u>/s/ Freda L. Wolfson</u>
                                                        Freda L. Wolfson
                                                        U.S. Chief District Judge

26